822 F.2d 518
 1987-2 Trade Cases 67,650, 8 Fed.R.Serv.3d 545
 In re BURLINGTON NORTHERN, INC., Burlington Northern
Railroad Co., Union Pacific Corp., Union Pacific Railroad
Co., Missouri Pacific Railroad Co., Kansas City Southern
Industries, Inc., Kansas City Southern Railway Co. & Chicago
& North Western Transportation Co., Petitioners.
 No. 87-2177.
 United States Court of Appeals,
Fifth Circuit.
 July 14, 1987.
Rehearing and Rehearing En Banc Denied Aug. 12, 1987.
 
 Gregg H. Levy, Mitchell F. Dolin, Covington & Burling, Washington, D.C., and B.J. Bradshaw, Richard N. Carrell, Fulbright & Jaworski, Houston, Tex., for Union Pacific Corp., Union Pacific R. Co. and Missouri Pacific R. Co.
 Mark F. Horning, John R. Labovitz, Washington, D.C., and W.T. Womble, Patricia Hair, Houston, Tex., for Burlington Northern, Inc. and Burlington Northern R. Co.
 John H. Shenefield, Morgan, Lewis & Bockius, Washington, D.C., for Kansas City Southern Inc. and Kansas City Southern R. Co.
 Gary Senner, Steven H. Frankel, Sonnenschein, Carlin, Nath & Rosenthal, Chicago, Ill., for Chicago & North Western Transp. Co.
 John L. Murchison, Jr., Harry M. Reasoner, Vinson & Elkins, Houston, Texas, Michael J. Henke, C. Michael Buxton, Vinson & Elkins, Washington, D.C., Gilbert I. Low, Orgain, Bell & Tucker, Beaumont, Texas for ETSI.
 Charles W. Lane, III, Howard E. Sinor, Jr., Jones, Walker, Waechter, Poitevent, Carrere & Denegre, New Orleans, La., for Arkansas Power & Light Co. and Utility Fuels, Inc.
 Ralph S. Carrigan, Rufus W. Oliver, III, Baker & Botts, Houston, Tex., for Houston Lighting & Power Company.
 Harold P. Degenhardt, Gibson, Dunn & Crutcher, Dallas, Tex., for Atchison, Topeka & Santa Fe.
 Robert M. Spire, Atty. Gen., State of Neb., and Leroy W. Sievers, Asst. Atty. Gen., Lincoln, Neb., for State of Neb. (Dept. of Justice).
 Eliza Ovrom, Asst. Atty. Gen., Des Moines, Iowa, for State of Iowa.
 Curtis Thompson, Asst. Atty. Gen., Jefferson City, Mo., for State of Mo.
 Before BROWN, REAVLEY and JOLLY, Circuit Judges.
 REAVLEY, Circuit Judge:
 
 
 1
 The plaintiffs in this antitrust suit claim that the defendant railroads conspired to prevent construction of a coal slurry pipeline. Contending, among other things, that the railroads accomplished their anticompetitive goal through filing and defending certain lawsuits, the plaintiffs seek discovery of documents relating to those lawsuits. The railroads resist discovery on the grounds of attorney/client privilege and work product immunity. The district court rejected this claim of privilege, holding that because the documents were prepared in furtherance of an illegal conspiracy they fall within the crime/fraud exception to the privilege. The railroads claim the protection of Noerr-Pennington for their litigation activities and seek a writ of mandamus. We conclude that the district court erred in allowing discovery without considering whether the litigation activities themselves were significantly motivated by a genuine desire for judicial relief. We reject, however, the railroads' contention that the district court is precluded from finding sham by the railroads' partial success in one of the lawsuits and their defensive posture in the other lawsuits.
 
 
 2
 * Background
 
 
 3
 The underlying antitrust claim here arises from Energy Transportation Systems, Inc., and ETSI Pipeline Project's (collectively ETSI) unsuccessful attempt to build a coal slurry pipeline from Wyoming to Arkansas.[1] ETSI claims the defendant railroads, afraid of losing business to the pipeline, unlawfully conspired to prevent, or at least delay and make more expensive, the pipeline's construction by denying permission for it to cross their rights-of-way and by engaging in sham administrative and judicial challenges to ETSI attempts to secure crossing rights, water rights, and administrative permits. After more than ten years of trying to obtain all of the necessary rights, permits, and financing, ETSI abandoned the project in 1984. It now alleges that the project's failure was caused by the railroads' illegal conspiracy and seeks a judgment against the railroads of $4.2 billion in damages after trebling. This mandamus petition arises from ETSI's desire to obtain documents prepared in connection with the railroads' allegedly sham litigation activities. Specifically at issue here are documents from two groups of lawsuits.
 
 A. The Andrews Litigation
 
 4
 The first group consists of consolidated lawsuits that the parties refer to as the Andrews litigation. The Andrews lawsuits were brought to invalidate a water contract between ETSI and the United States Department of the Interior that would allow ETSI to purchase water from the federal Oahe Reservoir in South Dakota for use in its pipeline. The plaintiffs in the lawsuits included three states--Missouri, Iowa, and Nebraska--several environmental and farmers' groups, and one of the defendant railroads--Kansas City Southern. Another railroad--Union Pacific--provided legal assistance through its attorneys to the state of Nebraska. The Andrews plaintiffs asserted numerous grounds for invalidating the contract; they have thus far been successful in their position that the Secretary of the Interior did not have statutory authority to execute the contract without the participation of the Army Corps of Engineers. See Missouri v. Andrews, 586 F.Supp. 1268 (D.Neb.1984), aff'd, 787 F.2d 270 (8th Cir.1986), cert. granted, --- U.S. ----, 107 S.Ct. 1346, 94 L.Ed.2d 517 (1987).
 
 B. The Window Litigation
 
 5
 The second group of lawsuits from which ETSI seeks documents consists of a series of suits ETSI brought to establish rights to cross the railroads' rights of way. In the very early stages of the pipeline project, ETSI attempted to negotiate the purchase of these crossing rights. When these efforts proved unavailing, allegedly because of an unlawful agreement between the railroads to jointly withhold crossing rights, ETSI began locating places along the railroads' property where the railroads owned only an easement rather than a fee title. It then purchased easements from the underlying landowner and brought suit to establish that these easements were sufficient to allow it to cross under the railroads' tracks without the railroads' consent. The parties refer to these easements as windows and to ETSI's lawsuits as the window litigation. Apparently, ETSI was essentially successful in every one of these window suits, all of which involved virtually identical issues.
 
 
 6
 The railroads have refused to turn over many of the documents ETSI seeks on the ground of attorney/client privilege or attorney work product immunity. ETSI filed a motion to compel production of these withheld documents on the ground they were prepared in connection with a violation of the antitrust laws. The railroads argued in response that to obtain discovery ETSI had to show that their litigation activities were sham activities and thus not protected by the Noerr-Pennington doctrine.[2] A special master agreed with the railroads and concluded that ETSI had not made the requisite showing. The district court, however, disagreed and granted ETSI's motion. The railroads filed this petition for a writ of mandamus.
 
 II
 Justification For Mandamus Relief
 
 7
 Before reaching the merits, we must address ETSI's contention that a writ of mandamus is not an appropriate mechanism to review this discovery ruling. ETSI correctly points out that "mandamus has historically been a drastic remedy generally reserved for really 'extraordinary' cases." In re Equal Employment Opportunity Commission, 709 F.2d 392, 394 (5th Cir.1983) (citing Kerr v. United States District Court, 426 U.S. 394, 402, 96 S.Ct. 2119, 2123, 48 L.Ed.2d 725 (1976). It argues that because the district court's ruling was neither a "usurpation of judicial power" nor a "clear abuse of discretion," see Bankers Life & Casualty Co. v. Holland, 346 U.S. 379, 383, 74 S.Ct. 145, 148, 98 L.Ed. 106 (1953), we should dismiss the petition without reaching the merits.
 
 
 8
 In recent years, several courts have concluded that mandamus is an appropriate method of review of orders compelling discovery against a claim of privilege. See United States Department of Energy v. Brimmer, 776 F.2d 1554, 1559 (Temp.Emer.Ct.App.1985), cert. denied, --- U.S. ----, 106 S.Ct. 1261, 89 L.Ed.2d 571 (1986); Sporck v. Peil, 759 F.2d 312, 314-15 (3d Cir.), cert. denied, 474 U.S. 903, 106 S.Ct. 232, 88 L.Ed.2d 230 (1985); Bogosian v. Gulf Oil Corp., 738 F.2d 587, 591-92 (3d Cir.1984); Diversified Industries, Inc. v. Meredith, 572 F.2d 596, 599 (8th Cir.1977); Heathman v. United States District Court, 503 F.2d 1032, 1033 (9th Cir.1974); Pfizer Inc. v. Lord, 456 F.2d 545, 547-48 (8th Cir.1972); Harper & Row Publishers v. Decker, 423 F.2d 487, 492 (7th Cir.1970), aff'd by an equally divided court, 400 U.S. 348, 91 S.Ct. 479, 27 L.Ed.2d 433 (1971); see also 16 C. Wright, A. Miller, E. Cooper & E. Gressman, Federal Practice and Procedure Sec. 3935, at 247-48 (1977). These cases have recognized the importance of the asserted privilege and the absence of an adequate alternative method of obtaining review. They also have relied on the seriousness and novelty of the privilege issue in the particular case. Respected commentators have similarly noted that the difficulty of obtaining effective review of discovery orders, the serious injury that sometimes results from such orders, and the often recurring nature of discovery issues support use of mandamus in exceptional cases. 15 C. Wright, A. Miller & E. Cooper, Federal Practice and Procedure Sec. 3914, at 576-77 (1976); 9 J. Moore, B. Ward & J. Lucas, Moore's Federal Practice p 110.28, at 313 (2d ed. 1987).
 
 
 9
 We believe this case presents the exceptional circumstances making mandamus review appropriate. The district court's order directs production of several thousand documents for which attorney/client privilege and work product immunity have been asserted. These documents go to the heart of the controversy between the parties, and disposition of this petition not only implicates the important policies protecting privileged documents but will likely have a determinative impact on the course of the case. Erroneous disclosure of these documents could be irreparable. It is also significant that, unlike the typical discovery order, the district court's order was not a mere discretionary one but rather turns on legal questions appropriate for appellate review. The issues here also have importance beyond the immediate lawsuit. The interrelationship of the attorney/client privilege's crime/fraud exception and the Noerr-Pennington doctrine with its sham limitation is a question which we do not find addressed in the decisions but which is likely to recur in future cases. Given the nature of the analysis required in an antitrust case in which a Noerr-Pennington defense is asserted and a question of sham is raised, communication between the attorney directing the petitioning activity and his client will be highly relevant. Under the district court's ruling, such communications could be discovered upon a showing that the petitioning was part of a larger conspiracy even though the petition itself might be protected from antitrust scrutiny. Such an important and potentially far-reaching decision, which we hold below to be erroneous, is an appropriate one for our immediate review.
 
 III
 Litigation That Serves A Larger Conspiracy
 
 10
 Turning to the merits, we first address the primary ground on which the district court concluded that discovery of the documents was proper. Although recognizing that Noerr-Pennington might ultimately immunize the railroads' petitioning activities from antitrust liability, the district court determined that documents relating to such activity are nonetheless not immune from discovery when they relate to a larger conspiracy that is actionable. The court found that ETSI's evidence established a prima facie case that such a larger conspiracy in fact existed--a conspiracy to defeat the pipeline by a strategy of delaying and interfering with its construction--and that the railroads had consulted and used their attorneys to further this conspiracy. In particular, the court found that the railroads' administrative and judicial challenges to ETSI permits and contracts and their defense of the window lawsuits were in furtherance of this conspiracy. Based on these findings alone, the court concluded that it could order discovery of the documents relating to the litigation. The court was thus able to order discovery without ever reaching the question whether the Andrews litigation and the defense of the window lawsuits were sham. In making this ruling, the district court relied on cases from other circuits holding that Noerr-Pennington is not a bar to discovery. See, e.g., Associated Container Transportation (Australia) Ltd. v. United States, 705 F.2d 53 (2d Cir.1983); North Carolina Electric Membership Corp. v. Carolina Power & Light Co., 666 F.2d 50 (4th Cir.1981). In those cases, however, no claim of attorney/client privilege was asserted and the sole question was whether Noerr-Pennington alone barred discovery. The issue here is whether the attorney/client privilege bars discovery in the face of a claim that the communications relate to a crime or fraud. Noerr-Pennington is relevant only to the extent it determines whether a crime or fraud has been shown.
 
 
 11
 The broad-brush approach of the district court gives too little attention to the policies behind both the Noerr-Pennington doctrine and the privileges at stake here.[3] The basis for Noerr-Pennington immunity has been well documented. In Noerr, the Supreme Court was presented with a claim that an association of railroads had violated the antitrust laws by engaging in a massive publicity campaign designed to influence legislative and executive action against the trucking industry. The Court determined that the railroads' activity did not fall within the ambit of the antitrust laws. It stressed the importance in a representative democracy of the right of persons to "freely inform the government of their wishes." 365 U.S. at 137, 81 S.Ct. at 529. The Court also felt that construing the antitrust laws to reach the railroads' activity would raise "important constitutional questions" regarding the right to petition government and that it could not "lightly impute to Congress an intent to invade these freedoms." Id. at 138, 81 S.Ct. at 530. Pennington reaffirmed Noerr, holding that "[j]oint efforts to influence public officials do not violate the antitrust laws even though intended to eliminate competition. Such conduct is not illegal, either standing alone or as part of a broader scheme itself violative of the Sherman Act." 381 U.S. at 670, 85 S.Ct. at 1593.
 
 
 12
 The Court in Noerr acknowledged, in a statement that is the genesis of the current "sham" doctrine, that some petitions, "ostensibly directed toward influencing governmental action, [may be] a mere sham to cover what is actually nothing more than an attempt to interfere directly with the business relationships of a competitor and the application of the Sherman Act would be justified." Id. at 144, 81 S.Ct. at 533. The railroads were protected, however, because they "were making a genuine effort to influence legislation." Id. The principle thus emerging from these decisions is that genuine efforts to influence governmental decisionmaking are to be encouraged, not penalized through application of the antitrust laws. Protection exists even though the petitioner's avowed purpose is to eliminate a competitor and even though the petitioner may be engaged in a larger unprotected scheme designed to do just that. Despite the potential anti-competitive effects of petitioning so motivated and occurring in such a context, the Supreme Court has made the policy choice to "assure 'uninhibited access to government policy makers.' " Coastal States Marketing, Inc. v. Hunt, 694 F.2d 1358, 1363 (5th Cir.1983) (quoting George R. Whitten Jr., Inc. v. Paddock Pool Builders, Inc., 424 F.2d 25, 32 (1st Cir.), cert. denied, 400 U.S. 850, 91 S.Ct. 54, 27 L.Ed.2d 88 (1967)).
 
 
 13
 A similar policy choice underlies the attorney/client privilege and work product immunity. The attorney/client privilege rests on the need to "encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice." Upjohn Co. v. United States, 449 U.S. 383, 389, 101 S.Ct. 677, 682, 66 L.Ed.2d 584 (1981). The privilege's "benefits are all indirect and speculative; its obstruction is plain and concrete." 8 J. Wigmore, Evidence Sec. 2291 (McNaughton rev. 1961). Yet the privilege survives, based on the recognition that "sound legal advice or advocacy serves public ends and that such advice or advocacy depends upon the lawyer's being fully informed by the client." Upjohn, 449 U.S. at 389, 101 S.Ct. at 682. The privilege, of course, is subject to several exceptions, notably the crime/fraud exception asserted here. The crime/fraud exception recognizes that because the "client has no legitimate interest in seeking legal advice in planning future criminal activities," In re International Systems & Controls Corporation Securities Litigation, 693 F.2d 1235, 1242 (5th Cir.1982), society has no interest in facilitating such communications. Thus the exception demonstrates the policy: persons should be free to consult their attorney for legitimate purposes.
 
 
 14
 Work product immunity similarly derives from the desire to facilitate effective advocacy. Despite a broad policy in favor of liberal discovery, immunity exists for a lawyer's work product to protect the lawyer's ability to "work for the advancement of justice while faithfully protecting the rightful interests of his clients." Hickman v. Taylor, 329 U.S. 495, 510, 67 S.Ct. 385, 393, 91 L.Ed. 451 (1947). Just as with disclosure of communications between attorney and client, discovery of the attorney's "written statements, private memoranda and personal recollections," id., would inhibit the attorney's effort to fully explore and develop the position he has been asked to advocate. Indeed, recognition of this degree of similarity between the attorney/client privilege and work product immunity has led this court and others to hold that both are subject to the same crime/fraud exception. International Systems, 693 F.2d at 1242; In re Antitrust Grand Jury, 805 F.2d 155, 164 (6th Cir.1986); In re Sealed Case, 676 F.2d 793, 812 (D.C.Cir.1982); In re John Doe Corp., 675 F.2d 482, 492 (2d Cir.1982); In re Grand Jury Proceedings, 604 F.2d 798, 803 (3d Cir.1979).[4]
 
 
 15
 The district court erred in ordering discovery without considering whether the specific litigation activities were illegitimate. The attorney/client privilege and work product immunity protect communications and papers generated when a client engages his attorney for legitimate purposes. To the extent the railroads sought out their attorneys to bring lawful suits and consulted with them in connection with such suits, they were within the scope of this protection. That the railroads might also have consulted and received the help of their attorneys in connection with other activities that are not lawful does not change this conclusion. The focus must be narrowed to the specific purpose of the particular communication or document. To the extent the document deals with a protected activity, it is immune from discovery.
 
 
 16
 To hold otherwise would unduly infringe on the protection Noerr-Pennington extends to petitioning activities genuinely intended to influence governmental action, even though part of a larger scheme of anticompetitive conduct. The Supreme Court has recognized that such activities are desirable, and the attorney/client privilege and work product immunity further the policy behind this recognition by facilitating petitioning activity that, as in this case, requires the assistance of attorneys. To permit discovery of the documents withheld in this case on the basis of a larger conspiracy by the railroads would undermine the effectiveness of the very type of petitioning the Supreme Court's decisions have protected. Therefore to the extent ETSI seeks material directly connected with the railroads' litigation activities, the district court cannot order discovery without first determining that the litigation activity was itself in violation of the antitrust laws. In the context of this case, that determination will require resolution of the question whether the litigation was a sham.[5] We now turn to that question.
 
 IV
 District Court's Failure to Find Sham
 
 17
 ETSI argues that the district court, aside from its reasoning discussed in the preceding section of this opinion, made a factual determination that the railroads' litigation activities were sham. It attempts to show that this determination was correct and urges this court to deny the writ of mandamus on this basis. The railroads deny that the district court made any factual determination of sham.
 
 
 18
 We agree with the railroads that the district court failed to make an adequate finding that the railroads' litigation activities were sham. It is true, as ETSI contends, that the district court's memorandum opinion states that the railroads "were not engaged in a bona fide effort to secure governmental action." As we discuss below, this is essentially the conclusion that must be reached to decide that petitioning activities are not protected by Noerr-Pennington. Reading the opinion as a whole, however, it is apparent that the district court did not make the detailed factual inquiry necessary to support this conclusion. Instead, the district court relied on its conclusion that ETSI had made a prima facie showing that the railroads had engaged in an overall conspiracy to defeat the pipeline and that the petitioning was connected with this conspiracy. The court concluded that "[t]his connection ... taints the entire petitioning process with sham."
 
 
 19
 We have already rejected the district court's attempt to rely on the alleged overall conspiracy to directly abrogate the railroads' privilege. For similar reasons, we now reject reliance on the overall scheme in connection with finding sham. As we discussed earlier, the Supreme Court held in Pennington that genuine petitioning activities are "not illegal, either standing alone or as part of a broader scheme itself violative of the Sherman Act." 381 U.S. at 670, 85 S.Ct. at 1593. Based on this language, this court has held that antitrust liability cannot be predicated on otherwise protected litigation activity merely because the activity was part of a broader conspiracy. Feminist Women's Health Center, Inc. v. Mohammad, 586 F.2d 530, 543 (5th Cir.1978), cert. denied, 444 U.S. 924, 100 S.Ct. 262, 62 L.Ed.2d 180 (1979); see also Hospital Building Co. v. Trustees of Rex Hospital, 691 F.2d 678, 688 (4th Cir.1982), cert. denied, 464 U.S. 890, 104 S.Ct. 231, 78 L.Ed.2d 224 (1983); Alexander v. National Farmers Organization, 687 F.2d 1173, 1195 (8th Cir.1982). The holding in Pennington requires attention to the narrow petitioning activity at issue. The fact finder must determine, as to the particular petition, whether the petitioner was engaged in a genuine effort to influence governmental decisionmaking. If so, then antitrust liability cannot be based on that activity and the attorney/client privilege and work product immunity for documents directly related to the activity remain intact.
 
 
 20
 In relying on the overall scheme theory to find sham, the district court relied primarily on the Ninth Circuit's decision in Clipper Exxpress v. Rocky Mountain Motor Tariff Bureau, Inc., 690 F.2d 1240 (9th Cir.1982), cert. denied, 459 U.S. 1227, 103 S.Ct. 1234, 75 L.Ed.2d 468 (1983). That decision, however, does not support the district court's ruling. The court there reversed a grant of summary judgment to the defendants in an antitrust case in which the alleged anticompetitive conduct consisted of petitioning and other unlawful activity. The Ninth Circuit held that summary judgment was improper even if Noerr-Pennington protected the petitioning because if "Clipper can prove that the defendants engaged in activities which violated the antitrust laws, those violations do not become immune simply because the defendants used legal means--protests before the ICC--as a means to enforce the violations." Id. at 1264. The court's holding was that Noerr-Pennington "provides immunity only for the narrow petitioning activity," id. at 1265, and that this immunity does not provide "overall immunity" to other violations, id. at 1263. The court did not hold, and could not hold consistently with Pennington, that the overall scheme makes the otherwise protected petitioning a sham.
 
 V
 Sham Petitioning
 
 21
 In their petition for mandamus, the railroads ask that we direct the district court to adopt the special master's tentative ruling that the railroads' litigation activities were not sham as a matter of law. The railroads assert that the Andrews lawsuits cannot be found to be a sham because the railroads were successful. As to the window lawsuits, they assert no sham can be found because of the railroads' defensive posture. We disagree.
 
 A. Successful Lawsuits as Sham
 
 22
 The argument that successful petitioning can never be a sham and thus subject to antitrust scrutiny is an appealing one. As this court has recognized, it is "difficult to conclude that the filing of a complaint constitutes a sham where the party seeking relief actually prevails." Mid-Texas Communications Systems, Inc. v. AT & T, 615 F.2d 1372, 1383 (5th Cir.), cert. denied, 449 U.S. 912, 101 S.Ct. 286, 66 L.Ed.2d 140 (1980); see also Coca-Cola Co. v. Overland, Inc., 692 F.2d 1250, 1257 & n. 17 (9th Cir.1982). As we discuss below, this is because success on the merits is forceful evidence that the petitioner did in fact wish to influence the governmental decision and obtain the relief prayed for.
 
 
 23
 We cannot, however, lay down a categorical rule that successful petitioning can never be a sham.[6] In Coastal States Marketing, Inc. v. Hunt, 694 F.2d 1358 (5th Cir.1983), we considered the circumstances under which litigation activities can be held to be a sham. We held that a "litigant should enjoy immunity from the antitrust laws so long as a genuine desire for judicial relief is a significant motivating factor underlying the suit." Id. at 1372. Our statement of this test flowed from Noerr 's teaching that sham petitioning is that which, although "ostensibly directed toward influencing governmental action, is a mere sham to cover what is actually nothing more than an attempt to interfere directly with the business relationships of a competitor." 365 U.S. at 144, 81 S.Ct. at 533. Coastal States recognized that the key to extending Noerr-Pennington protection is whether the antitrust defendant genuinely was attempting to influence governmental decisionmaking. If the defendant's intent was not to influence the government and obtain relief, but rather to harm a competitor through the mere invocation and maintenance of the process, he is not entitled to protection because he is not exercising the right of petition that formed the basis for the decision in Noerr. See Clipper Exxpress, 690 F.2d at 1255; see also Litton Systems, Inc. v. AT & T, 700 F.2d 785, 810 (2d Cir.1983), cert. denied, 464 U.S. 1073, 104 S.Ct. 984, 79 L.Ed.2d 220 (1984); Grip-Pak, Inc. v. Illinois Tool Works, Inc., 694 F.2d 466, 472 (7th Cir.1982), cert. denied, 461 U.S. 958, 103 S.Ct. 2430, 77 L.Ed.2d 1317 (1983); City of Gainesville v. Florida Power & Light Co., 488 F.Supp. 1258, 1265-66 (S.D.Fla.1980); P. Areeda & H. Hovenkamp, Antitrust Law 7 (Supp.1986) (hereinafter Areeda) ("When the antitrust defendant had not truly sought to influence a governmental decision, his invocation of governmental machinery is a sham.").
 
 
 24
 The Coastal States test for determining when petitioning activities are a sham recognizes that the "usual litigant will base its decision to sue on a number of factors." Coastal States, 694 F.2d at 1371. It focuses attention on the factors motivating the initiation and prosecution of the suit. Thus, it is not dispositive that the ultimate relief will be beneficial to the petitioner and will serve his purposes. It must be shown that the desire for relief was a significant factor underlying the actual bringing and prosecution of the suit. This requires an examination of the litigant's intent. Cf. Greenwood Utilities Commission v. Mississippi Power Co., 751 F.2d 1484, 1498 n. 9 (5th Cir.1985) ("[D]etermining whether the petitioning conduct was a sham often involves questions of motive or subjective intent."). It is important to note, however, that this inquiry is limited to the immediate purpose for the litigation. Noerr and Pennington hold that anticompetitive intent does not make petitioning a sham. Noerr, 365 U.S. at 138-40, 81 S.Ct. at 530-31; Pennington, 381 U.S. at 669-70, 85 S.Ct. at 1593. Thus, the entire effort may be part of an antitrust conspiracy, without which there would have been no litigation. The issue of intent that controls is whether the litigant wished to obtain his anticompetitive end through obtaining court-ordered relief or simply through the filing and maintenance of the lawsuits.
 
 
 25
 Our interpretation of the sham doctrine in Coastal States makes clear that success on the merits does not necessarily preclude an antitrust plaintiff from proving that the defendant's earlier litigation activities were sham. The determinative inquiry is not whether the suit was won or lost, but whether it was significantly motivated by a genuine desire for judicial relief. Of course, the success of the claim presented is persuasive evidence that the litigant in fact wanted the relief. It is highly unlikely that a party with a meritorious claim will not be significantly motivated by a desire to obtain relief on that claim. Thus, an antitrust plaintiff attempting to base liability on successful petitioning must overcome a strong inference that Noerr-Pennington applies and in many cases may be unable to do so. But reliance on the success of the earlier claim cannot substitute for proper consideration of any evidence the plaintiff might provide of the petitioner's motivation.
 
 
 26
 To be sure, "[d]etermining what efforts are not bona fide petitions to the government ... is a difficult task." Greenwood Utilities, 751 F.2d at 1498. Drawing the line at successful petitions--or at petitions that had a reasonable basis--would simplify this task somewhat. But we cannot say that important cases will not exist in which the evidence establishes that, despite having a meritorious claim, a party was motivated not by a desire to obtain relief but to harass and interfere with the activities of a competitor through the process itself. Accord Grip-Pak, 694 F.2d at 472. In this case, for example, ETSI claims the railroads were not interested in obtaining relief from the court in Andrews because the railroads realized their goal of defeating the pipeline depended primarily on delaying the project to the point it became so expensive to be infeasible as a competitive enterprise. It presents evidence that railroads made the decision to participate in the litigation without consideration of the possible merit of the suit. Of course, that the railroads realized that the delaying value of their lawsuit would aid their goal does not necessarily mean they did not in fact want relief from the court. But if ETSI can sustain its burden to show that the railroads were not significantly motivated by a "genuine desire for judicial relief," Coastal States, 694 F.2d at 1372, the railroads should not be able to invoke Noerr-Pennington as a shield to discovery of documents relating to that litigation.[7]
 
 
 27
 The preceding discussion should not be taken as a suggestion that the reasonableness of a suit is irrelevant for all purposes. We have concluded that objective reasonableness--as manifested by the court's grant of relief on the claim--should not protect a person who was not genuinely exercising his right to petition. However, as our discussion below of standing indicates, we believe that a complete lack of reasonableness necessarily must deprive a person of protection. A party who invokes the governmental decisionmaking process must have a reasonable basis for believing his claim might prevail. In other words, the requirement in Noerr and Coastal States that petitioning be motivated by a genuine desire for relief means that the desire for relief must be both honest and reasonable. This requirement serves the purpose of withholding protection from those persons who are not entitled to it, while at the same time recognizing the "wise policy [of] hold[ing] business actors to a standard of reasonable care in using governmental machinery." Areeda, at 11; see also id. at 7 ("To be sure, [a petitioner] would always be pleased to obtain a governmental decision against his rival. But where he had no reasonable expectation of obtaining the favorable ruling, his effort to do so was a sham."); Litton Systems, Inc. v. AT & T, 700 F.2d 785, 811-12 (2d Cir.1983), cert. denied, 464 U.S. 1073, 104 S.Ct. 984, 79 L.Ed.2d 220 (1984).[8]
 
 B. Lack of Standing as Sham
 
 28
 The requirement of reasonableness raises a second, albeit related, reason why we decline to adopt the railroads' argument that the result in the Andrews lawsuits precludes finding a sham. The one railroad who joined the Andrews litigation as a party--Kansas City Southern (KCS)--was initially dismissed for lack of standing. The court later vacated that ruling as to some of KCS's claims when KCS filed an amended complaint and additional affidavits as to its interest in the case. However, because the court had already ruled on the merits and granted an injunction in favor of the plaintiffs who had standing, it declined to finally resolve KCS's standing. On appeal, the Eighth Circuit also found it unnecessary to resolve KCS's standing, as it agreed with the district court's ruling that the state plaintiffs had standing and affirmed the injunction on that basis. Missouri v. Andrews, 787 F.2d 270, 274 (8th Cir.1986), cert. granted, --- U.S. ----, 107 S.Ct. 1346, 94 L.Ed.2d 517 (1987).
 
 
 29
 We do not believe Noerr-Pennington extends to a litigant who has not properly invoked a court's power to act in a case, even though the petitioner may otherwise genuinely desire relief on a meritorious claim. Unlike the legislative arena, substantial limits exist on the ability of persons to pursue claims in the courts. In particular, a person whose interest in a controversy is not sufficient to confer standing has no right to petition the court as a party and obtain relief. Thus, a person cannot reasonably claim that his participation in a lawsuit in which he has no standing is a genuine attempt to influence governmental decisionmaking. Of course, a person has a right to assert his claim of standing along with his claim on the merits and seek to influence the court to recognize his interest in the controversy. Thus, to the extent the litigant has a reasonable basis for believing that his claim of standing might be accepted by the court, and thus that he will have the right to participate in the litigation process and obtain relief, he will be protected by Noerr-Pennington even though he ultimately loses.[9] But a bystander to a controversy who either knows he has no standing or who has no reasonable basis for asserting standing but who nonetheless files or joins in a lawsuit cannot claim the protection Noerr-Pennington extends to genuine attempts to influence judicial decisionmaking. See Landmarks Holding Corp. v. Bermant, 664 F.2d 891, 896 (2d Cir.1981) (defendants appealed from zoning commission decisions "knowing that they lacked standing to do so"); cf. MCI Communications Corp. v. AT & T, 708 F.2d 1081, 1156 (7th Cir.1983) ("There can be no genuine attempt to petition the government when the petitioners know in advance that the governmental body lacks the authority to take the action desired."), cert. denied, 464 U.S. 891, 104 S.Ct. 234, 78 L.Ed.2d 226 (1983).[10]
 
 
 30
 The participation of the only other railroad actively involved in the Andrews litigation--Union Pacific--raises similar difficulties. Unlike KCS, Union Pacific never attempted to join the litigation as a party. Instead, it provided legal assistance through its attorneys to the state of Nebraska, a named plaintiff in one of the suits. Union Pacific paid the fees of its attorneys for this assistance, which apparently involved extensive research assistance and document drafting. The parties dispute the precise role Union Pacific played in Nebraska's decision to seek its assistance and to file suit. The parties also dispute the degree to which others in the litigation were aware of Union Pacific's involvement, but it appears to be largely agreed that most parties, as well as the district court itself, were unaware that Nebraska was being assisted.
 
 
 31
 Union Pacific's activity presents difficult questions regarding the scope of Noerr-Pennington 's protection and the constitutional right to petition. The railroads have argued that Noerr itself answers these questions in favor of protecting Union Pacific's activities. In Noerr, the railroad industry hired a public relations firm to conduct their publicity campaign against the trucking industry. Much of the campaign was carried out through a "third-party technique, that is, the publicity matter circulated in the campaign was made to appear as spontaneously expressed views of independent persons and civic groups, when, in fact, it was largely prepared and produced by [the public relations firm] and paid for by the railroads." 365 U.S. at 130, 81 S.Ct. at 525. The Supreme Court rejected the lower court's view that this aspect of the railroads' activity justified application of the antitrust laws.
 
 
 32
 The railroads here argue that the holding in Noerr dictates that Union Pacific's assistance to Nebraska, which they assert was more benign than the misleading conduct in Noerr, be protected. We disagree. As the Court's subsequent decision in California Motor Transport Co. v. Trucking Unlimited, 404 U.S. 508, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972), makes clear, significant differences exist between attempts to influence legislative decisionmaking and attempts to influence the judiciary. Noerr emphasized the highly political nature of the railroads' petitioning activities and Congress's traditional caution "in legislating with respect to problems relating to the conduct of political activities." Noerr, 365 U.S. at 141, 81 S.Ct. at 531. In contrast, as we noted above, the right to petition the courts and the methods that properly may be used in such petitioning have been carefully circumscribed. Cf. 1 P. Areeda & D. Turner, Antitrust Law 48 (1978) ("[T]he legislative and judicial reluctance to regulate political activities has never affected litigation."). We do not believe that Noerr 's extension of protection to the railroads' publicity campaign controls the disposition of the issue of protection for Union Pacific's activities.
 
 
 33
 Indeed, we believe it would be an unwarranted extension of Noerr-Pennington 's protection to hold that a party without an interest in a case sufficient to allow it to directly petition the courts may nonetheless indirectly seek its anticompetitive goals through encouraging and assisting the lawsuits of others.[11] Noerr was based largely on the principle that government relies to a large degree on the "ability of persons to make their wishes known to government." 365 U.S. at 137, 81 S.Ct. at 529. It further recognized that prohibiting those with a competitive interest in governmental action from petitioning the government as to that action would "deprive the government of a valuable source of information and, at the same time, deprive the people of their right to petition in the very instances in which that right may be of the most importance to them." Id. at 139, 81 S.Ct. at 531. In this case, however, our holding subjects to antitrust scrutiny only those persons whose interests are such that Congress or the courts have independently determined not to be the proper parties to assert the claim in court. To the extent a party has an interest in a case sufficient to support a reasonable claim of standing, his efforts to directly or indirectly participate in the litigation are protected. We do not believe that the policies behind Noerr-Pennington dictate any greater protection than this.
 
 
 34
 We recognize the constitutional underpinnings of the Noerr-Pennington doctrine and that Union Pacific's activities to some degree implicate constitutional protections. See NAACP v. Button, 371 U.S. 415, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963) (protecting the NAACP's right to advise persons of their legal rights and solicit their involvement in racial discrimination suits); In re Primus, 436 U.S. 412, 98 S.Ct. 1893, 56 L.Ed.2d 417 (1978) (protecting the ACLU's right to give legal advice and solicit involvements in lawsuits). The First Amendment, however, does not extend blanket protection to all activities involving association together to pursue goals through litigation. In Ohralik v. Ohio State Bar Association, 436 U.S. 447, 98 S.Ct. 1912, 56 L.Ed.2d 444 (1978), for example, the Court held that a state may prohibit lawyer solicitation in circumstances that are conducive to fraud, undue influence, and other forms of vexatious conduct. The Court has also "recognized the strong governmental interest in certain forms of economic regulation, even though such regulation may have an incidental effect on rights of speech and association." NAACP v. Claiborne Hardware Co., 458 U.S. 886, 912, 102 S.Ct. 3409, 3425, 73 L.Ed.2d 1215 (1982).
 
 
 35
 We believe that the interests supporting application of the antitrust laws to prohibit and penalize anticompetitive conduct are sufficiently strong to dispel any constitutional difficulties in withholding Noerr-Pennington protection from persons who, without the right to petition the courts directly, seek to further their anticompetitive goals through funding, encouraging, and assisting the lawsuits of others.[12] We do not believe the First Amendment protects a competitor's right to accomplish economic predation through such means. Unlike the regulations struck down in Button and Primus, which broadly prohibited all solicitation activities of the NAACP and ACLU without a showing of any substantive evil flowing from such activity, withholding Noerr-Pennington protection here simply opens the door for ETSI to show that Union Pacific's activity was harmful anticompetitive conduct. The governmental interest in allowing this showing to be made, coupled with the weak claim to protection for such activity, amply justifies our holding here.
 
 C. Defending Lawsuits as Sham
 
 36
 The railroads also argue that their participation in the window lawsuits cannot be a sham as a matter of law because they were defendants in those lawsuits. This point need not detain us long. We certainly agree with the Seventh Circuit's observation that one "cannot start a suit ... and then sue the defendant for refusing to default." Brunswick Corp. v. Riegel Textile Corp., 752 F.2d 261, 272 (7th Cir.1984), cert. denied, 472 U.S. 1018, 105 S.Ct. 3480, 87 L.Ed.2d 615 (1985). But the allegations made and evidence presented by ETSI go beyond that. ETSI claims the railroads knew that they had no viable defense in those suits but that they nonetheless filed defensive pleadings and sought discovery for the purpose of further delaying the pipeline project and obtaining information that could be used in other forums to hinder the project. ETSI points out that it was successful in obtaining the relief it sought in each of the window lawsuits it filed and that the railroads continued to litigate each case long after their arguments had been repeatedly rejected by the courts.
 
 
 37
 We believe that ETSI's claims, if found by the district court to be supported by prima facie evidence, are sufficient to deprive the railroads' defense of the window litigation of Noerr-Pennington protection. We perceive no reason to apply any different standard to defending lawsuits than to initiating them. Therefore, to the extent the railroads' activities in the window lawsuits were not significantly motivated by an honest and reasonable desire to influence the court's decision and affect the outcome of the case they are not entitled to protections from antitrust scrutiny.[13]
 
 VI
 Waiver of Privilege
 
 38
 The final issue we must address is ETSI's contention that an independent ground exists for leaving undisturbed the district court's ruling. ETSI claims that the railroads waived their asserted privileges by relying on a defense that puts their attorney/client communications and work product at issue. It argues that an antitrust defendant who relies on Noerr-Pennington bears the burden of proving the genuineness of his petitioning activities, and, having thus injected his good faith into the case, waives any privilege to documents bearing on that issue. We disagree.
 
 
 39
 We cannot accept the proposition that a defendant in an antitrust suit who relies on the protection afforded by Noerr-Pennington necessarily gives up the right to keep his communications with his attorney confidential. Such a rule certainly cannot be justified on the basis of waiver. This is not a case in which a party has asserted a claim or defense that explicitly relies on the existence or absence of the very communications for which he claims a privilege. See, e.g., United States v. Woodall, 438 F.2d 1317, 1324-26 (5th Cir.1970), cert. denied, 403 U.S. 933, 91 S.Ct. 2262, 29 L.Ed.2d 712 (1971). A defendant who relies on Noerr-Pennington merely denies the existence of an antitrust violation. Cf. Areeda, at 4 (The "doctrine is in part an 'exception' or 'immunity' from normal antitrust principles ... but it principally reflects the absence of any antitrust violation to start with."). Accordingly, a plaintiff attempting to make an antitrust case based on conduct that involves lobbying or litigation bears the burden to show that such activity is not protected petitioning but a sham. Coastal States, 694 F.2d at 1372 n. 46; Mohammad, 586 F.2d 543. We do not see how it can be said that the railroads waived their privilege when it is ETSI who filed this lawsuit and who seeks to rely on attorney/client communications and work product to prove its claim.
 
 
 40
 Nor do we perceive any other basis for abrogating the railroads' privilege. Noerr-Pennington is based on the principles that individuals have a right to petition government and that government has a need for the information provided by such petitioning. As we noted earlier in this opinion, the protection afforded by the attorney/client privilege furthers these principles. Under the rule ETSI suggests, whenever a competitor files a lawsuit alleging that some earlier petitioning was a sham and the defendant denies the allegation, the defendant would lose his privilege. This result would be inconsistent with both Noerr-Pennington and the attorney/client privilege. Attorney/client documents may be quite helpful in making out a claim of sham, but this is not a sufficient basis for abrogating the privilege.
 
 VII
 Conclusion
 To recapitulate, we hold:
 
 41
 1. Even if prior litigation was part of an overall conspiracy which itself violated antitrust law, Noerr-Pennington requires a prima facie finding that the particular litigation was a sham to warrant discovery of documents initially protected by the attorney/clientrivilege or work product immunity.
 
 
 42
 2. The litigation was a sham, and the documents subject to discovery, if the litigation was undertaken without a genuine desire for judicial relief as a significant motivating factor, or if there was no reasonable expectation of judicial relief, or if there was no reasonable basis for party standing.
 
 
 43
 3. It is possible for litigation which ultimately succeeds to have been sham.
 
 
 44
 4. Defensive litigation can be sham.
 
 
 45
 5. The antitrust suit defendant who raises the Noerr-Pennington claim to protect its conduct in prior litigation does not thereby waive the attorney/client privilege or work product immunity.
 
 
 46
 We conclude that the district court acted improperly in granting ETSI's motion to compel discovery without making a proper factual determination that the individual petitioning activities in which the railroads were engaged were sham. Should ETSI renew its motion to discover the documents for which the railroads have asserted privilege, and if the district court should then conclude that ETSI has made a prima facie showing that the litigation--affirmative or defensive--is or was a sham, then at that moment the attorney/client and work product privileges will evaporate so that all material in the litigation will be subject to discovery bearing on further proof or establishment that the litigation is sham. While the material is not available initially to establish a prima facie case, once that point is reached, there is nothing in Noerr-Pennington, much less in attorney/client or work product, to shield such dramatic evidence from the finder of fact. Any different rule would permit one or all of the testimonial privileges to shield forever dramatic, perhaps even conclusive, proof of exactly what sets aside those privileges under the law.
 
 
 47
 Upon receipt of this opinion the district judge will, undoubtedly without order from us, promptly vacate his order.
 
 
 48
 Writ Conditionally GRANTED.
 
 
 49
 E. GRADY JOLLY, Circuit Judge, concurring in result:
 
 
 50
 I am pleased to concur in the result reached by the majority in Judge Reavley's very thoughtful opinion. I respectfully dissent to the extent that the majority holds that a lawsuit, reasonably based on fact and law, if improperly motivated, may constitute a sham under the Noerr-Pennington doctrine. When we speak of the right to file a lawsuit, we are speaking of rights guaranteed by the Constitution. As is made clear by California Motor Transport Co. v. Trucking Unlimited, 404 U.S. 508, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972), the Supreme Court's holding that antitrust laws cannot punish the legitimate use of the courts is grounded upon the first amendment right to petition the government for redress of grievances. Id. at 510, 92 S.Ct. at 611. As a general rule, once the right is found to be protected, i.e., a reasonable legal and factual basis for the lawsuit, improper motivation for asserting the right will not defeat constitutional protection, as is illustrated by the Supreme Court's holding that motivation to violate antitrust laws does not vitiate the first amendment right to use the courts for that purpose; only when the assertion is a "sham" is constitutional protection lost. A successful lawsuit is not, and cannot be, constitutionally speaking, a sham upon the courts; neither can any lawsuit unless it is baseless.
 
 
 51
 For confirmation of this principle, we need only turn to the Supreme Court's most recent pronouncement on the constitutional right of access to the courts. In Bill Johnson's Restaurants, Inc. v. NLRB, 461 U.S. 731, 103 S.Ct. 2161, 76 L.Ed.2d 277 (1983), an employer used the state courts to sue his lawfully picketing employees for injunctive relief and monetary damages. The National Labor Relations Board issued a cease and desist order against the employer on grounds that the sole purpose of using the courts was to retaliate against the employees for exercising their protected statutory rights.
 
 
 52
 Noting that baseless litigation is not immunized by the first amendment right to petition, the Court stated that such considerations "led us in the antitrust context to adopt the 'mere sham' exception in California Motor Transport Co. v. Trucking Unlimited, 404 U.S. 508, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972). We should follow a similar course under the NLRA." The Court then proceeded to make absolutely clear that the finding of a sham, in order to defeat constitutional protection to use the courts, is two-pronged: first, the lawsuit must be baseless, and, second, it must be prosecuted with the intent of retaliating against the employee. This specific two-pronged holding, requiring both improper motivation and a baseless lawsuit, was reiterated throughout the opinion ("improperly motivated suit lacking a reasonable basis, ... baseless lawsuit with intent of retaliating," 461 U.S. at 744, 103 S.Ct. at 2170; "[r]etaliatory motive and lack of reasonable basis are both essential prerequisites," id. at 748, 103 S.Ct. at 2173; "unmeritorious lawsuit for a retaliatory purpose," id. at 749, 103 S.Ct. at 2173).
 
 
 53
 Addressing specifically whether a meritorious lawsuit can be a sham, the Court stated: "[I]f the employer's case in the state court ultimately proves meritorious and he has a judgment against the employees, the employer should also prevail before the Board, for the filing of a meritorious lawsuit, even for retaliatory motive, is not an unfair labor practice." Id. at 747, 103 S.Ct. at 2172.
 
 
 54
 After a determination has been made that a lawsuit is baseless, the subjective intent of the parties will become relevant in determining whether the initial filing and prosecution of the lawsuit enjoys constitutional protection. In Bill Johnson's Restaurants, Inc., for example, Justice White observed that if the judgment went against the employer in that case, "[t]he employer's suit having proved unmeritorious, the Board would be warranted in taking that fact into account in determining whether the suit had been filed in retaliation for the exercise of the employees' Sec. 7 rights." Id.
 
 
 55
 Therefore, because I believe that the issue of whether a lawsuit may constitute a sham is controlled by Bill Johnson's Restaurants, Inc., I respectfully dissent from the majority's holding that a lawsuit, grounded upon a reasonable basis in fact and law, may constitute a sham.
 
 
 
 [1]
 According to the parties, coal slurry is a mixture of ground coal and water. The slurry is pumped through the pipeline and then dried to be used as fuel. The proposed pipeline was later expanded to include delivery to utilities in Texas
 
 
 [2]
 This doctrine, described in detail below, derives from the decisions in Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc., 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961), and United Mine Workers v. Pennington, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965)
 
 
 [3]
 The remainder of this opinion demonstrates that the parties dispute several points in this petition. A few things, however, are not in dispute. For the purposes of its ruling, the district court assumed that the railroads had an otherwise valid claim of privilege or immunity and that the documents would not be discoverable absent the crime/fraud exception. Thus we are not presented with any question about the initial existence of privilege or immunity. The parties also do not challenge the district court's conclusion that a civil violation of the antitrust laws is a "crime" or "fraud" for purposes of abrogating the attorney/client privilege. See Pfizer Inc. v. Lord, 456 F.2d 545 (8th Cir.1972). Finally, there is no dispute over the district court's ruling that ETSI's burden in seeking discovery is to make out a prima facie case that the documents were prepared in furtherance of a crime or fraud. In re International Systems & Controls Corporation Securities Litigation, 693 F.2d 1235, 1242 (5th Cir.1982)
 
 
 [4]
 Work product material, unlike attorney/client communications, is subject to discovery under the provisions of Fed.R.Civ.P. 26(b)(3). Although ETSI has sought discovery under Rule 26 in the district court, this issue is not before us on this petition for mandamus
 
 
 [5]
 Our direction here that the court must focus on the specific relationship of the communication to a protected activity is consistent with our earlier holding that piercing a claim of privilege through the crime/fraud exception requires a showing that the material "reasonably relate[s] to the fraudulent activity." International Systems, 693 F.2d at 1243. As the court from which we adopted this test stated, "[t]he exact formulation of a 'test' for relatedness is less important than an understanding of what the test must accomplish: easy differentiation between material for which the law should not furnish the protections of a privilege and material for which a privilege should be respected." In re Sealed Case, 676 F.2d 793, 815 n. 91 (D.C.Cir.1982). In this case, we have determined that the policies behind Noerr-Pennington require protection for material that is directly in furtherance of lawful litigation activity
 
 
 [6]
 The commentators take varying positions on the question whether a successful suit can be considered a sham. Areeda and Hovenkamp state generally that "successful judicial action is not a 'sham,' " but add the caveat that this is "merely a strong presumption, rather than a categorical rule." P. Areeda & H. Hovenkamp, Antitrust Law 11, 13 (Supp.1986). They also refer approvingly to our decision in Coastal States Marketing, Inc. v. Hunt, 694 F.2d 1358 (5th Cir.1983), the decision upon which we now rely to hold that some successful petitioning may be found to be sham. Areeda, at 16 ("Perhaps we cannot hope to be more precise than to say with the Fifth Circuit's Coastal States decision that a litigant 'should enjoy petitioning immunity from the antitrust laws so long as a genuine desire for judicial relief is a significant motivating factor underlying the suit.' ")
 Kinter and Bauer note that success is strong evidence of a legitimate petition, but state that even successful claims may be considered to be sham. Kinter & Bauer, Antitrust Exemptions for Private Requests for Governmental Action: A Critical Analysis of the Noerr-Pennington Doctrine, 17 U.C. Davis L.Rev. 549, 576 (1984).
 Handler and DeSevo assert that success on the merits absolutely precludes a finding of sham. Handler & DeSevo, The Noerr Doctrine and Its Sham Exception, 6 Cardozo L.Rev. 1, 30-31 (1984). This view is based on their reading of Noerr and Pennington to preclude any examination of the petitioner's intent for any purpose. As we discuss below, we read Noerr 's statement that sham petitioning is that which is not genuinely intended to influence governmental decisionmaking to require an examination of the litigant's intent to the extent of asking whether the petition was motivated by a desire for the relief sought.
 
 
 [7]
 Judge Jolly disagrees at this point and argues that Bill Johnson's Restaurants, Inc. v. NLRB, 461 U.S. 731, 103 S.Ct. 2161, 76 L.Ed.2d 277 (1983), dictates that Noerr-Pennington protection be extended to any case that has a reasonable legal and factual basis. The question in that case was whether the NLRB could enjoin a state court proceeding that had a reasonable basis on the ground that it was motivated by a desire to retaliate against striking employees. The Court held that it could not. The Court did not, however, state a constitutional rule that all lawsuits with a reasonable basis are immune from the application of otherwise valid regulation. Rather, it construed congressional intent behind the NLRA in light of the constitutional right to petition and earlier Supreme Court cases that have held that the NLRA does not preempt states from providing a civil remedy for tortious conduct occurring during a labor dispute. Id. at 740-44, 103 S.Ct. at 2168-70. Given the constitutional implications and the lack of preemption, the Court concluded that the NLRA does not empower the Board to enjoin lawsuits solely on the basis of retaliatory motive. The Court did not define sham for purposes of the antitrust laws, nor did it consider the situation in which the litigant, in addition to having a motive generally proscribed by the regulation at issue, also has no significant desire to obtain the relief prayed for. We therefore find no inconsistency between Bill Johnson's and our reading of Fifth Circuit controlling precedent in the antitrust area
 
 
 [8]
 Professors Areeda and Hovenkamp also state that they would not withhold protection from a person who "had a reasonable claim in the other forum but did not subjectively know it." Areeda, at 10. They point to "[d]oubt about the wisdom of punishing such a person" and "the difficulty of properly proving subjective intent in the first place." Id. This statement seems to adopt a purely objective approach to determining sham. We disagree. As our discussion of successful petitioning demonstrates, the Supreme Court's decisions, as interpreted by this court and others, necessarily entail an examination of the petitioner's subjective motivations. Moreover, aside from the binding force of this precedent, we are not persuaded by the reasoning against subjecting some persons with objectively reasonable claims to antitrust scrutiny. Rather than punishing a person for simply not knowing the reasonableness of his claim, our ruling withholds Noerr-Pennington protection from persons who do not care about the reasonableness of their claim and who bring claims for the improper purpose of harming a competitor through the mere invocation of governmental decisionmaking processes. We do not believe the difficulty of inquiring into intent justifies a different rule; if a plaintiff can adduce sufficient evidence to overcome the strong inference that persons with meritorious claims wish to obtain relief upon them we believe he should prevail. We cannot endorse a rule that would require a court to blindly extend protection in the face of evidence that the party was in fact not exercising the protected right to petition. We also note that Areeda and Hovenkamp themselves would not preclude applying the antitrust laws to all petitions that had a reasonable basis. As noted earlier, supra note 9, they leave open the possibility of holding some successful petitions to be sham
 
 
 [9]
 ETSI devotes considerable argument in its brief to their claim that the railroads had no "legitimate interest in the outcome" of the Andrews litigation. To the extent this argument goes to the point we have just made in the text that parties without a reasonable basis for asserting standing are not protected by Noerr-Pennington, we agree. We disagree, however, if ETSI's claim goes beyond that to suggest that the railroads are not protected because they may have had no interest in the substantive law upon which the Andrews' court granted its relief. If the railroads' interest is such that they had a reasonable claim of standing, then their interest was sufficient to allow them the protected right to seek to influence the court's decision and obtain relief. That their motivation may have been to harm ETSI rather than to promote proper exercise of authority between the Department of Interior and the Army Corps of Engineers is irrelevant. See Noerr, 365 U.S. at 139-40, 81 S.Ct. at 531 ("[I]nsofar as the railroads' campaign was directed toward obtaining governmental action, its legality was not at all affected by any anticompetitive purpose it may have had.")
 
 
 [10]
 The Andrews district court did sustain the railroads' claim of standing as to some claims (none of which formed the basis for the ruling in that case), but we do not believe this to be dispositive. If the railroads did not actually and reasonably expect to prevail on the claims for which they had standing, or if that expectation was not a significant motivating factor underlying their decision to bring the suit, the existence of those claims should not protect them
 
 
 [11]
 Our discussion here assumes, without deciding, that Union Pacific had no reasonable claim of standing to participate in Andrews. Should the district court determine that Union Pacific had such a claim, the mere fact that Union Pacific did not actually formally join the litigation does not deprive it of protection
 
 
 [12]
 Our conclusion here results in the possible piercing of Union Pacific's claim of privilege for documents prepared in connection with the Andrews litigation. We do not address the extent to which these documents, or documents prepared in connection with KCS's participation in the litigation, might still be immune from discovery because of a privilege held by the state of Nebraska or other parties involved in that litigation. Indeed, after the district court's ruling granting ETSI's motion to compel discovery, Nebraska and others involved in the Andrews litigation sought a protective order from the district court against disclosure of documents as to which they hold a privilege. The district court did not rule on that motion because of the pendency of the present petition. These parties have filed amicus briefs in this court urging that we recognize their claims of privilege, especially in light of the pendency of the Andrews case before the Supreme Court. We are confident the district court in any further rulings on ETSI's discovery motions will act to safeguard any viable privilege these parties hold
 
 
 [13]
 The railroads also claim that the district court cannot conclude the window lawsuits defense was a sham because the special master made factual findings to the contrary that were not clearly erroneous. See Fed.R.Civ.P. 53(e). We do not agree that the district court was obligated to give any deference to the special master's findings in the case. At the time he submitted his report, the special master indicated his desire to receive comments and objections from the parties before preparing his final opinion. The parties submitted their objections but the master resigned his position before he could act on them. It appears, therefore, that the special master's report was only a preliminary one