STATE OF SOUTH DAKOTA, South Dakota Conservancy District, an Agency of the State of South Dakota, Appellee,

v.

KANSAS CITY SOUTHERN INDUS-TRIES, INC., a Foreign Corporation; Kansas City Southern Railway Company, a Foreign Corporation, Appellants.

STATE OF SOUTH DAKOTA, South Dakota Conservancy District, an Agency of the State of South Dakota, Appellants,

v.

KANSAS CITY SOUTHERN INDUS-TRIES, INC., a Foreign Corporation; Kansas City Southern Railway Company, a Foreign Corporation, Appellees (Two Cases).

Nos. 88-2158, 88-5375 and 88-5422.

United States Court of Appeals, Eighth Circuit.

Submitted Dec. 13, 1988.

Decided June 29, 1989.

As Amended on Denial of Rehearing and Rehearing En Banc Aug. 8, 1989.

John J. Shenefield, Washington, D.C., for appellant.

Glen H. Johnson, Rapid City, S.D. and Thomas J. Welk, Sioux Falls, S.D., for appellee.

Before LAY, Chief Judge, and HEANEY [*] and FAGG, Circuit Judges.

LAY, Chief Judge.

Kansas City Southern Industries and The Kansas City Southern Railway Company [1] appeal a judgment in favor of the State of South Dakota and the South Dakota Conservancy District,[2] of $600,000,000 which represents a trebled jury verdict of $200,-000,000 based on a federal antitrust claim. KCS also appeals a verdict of $244,200,000 awarded to SD on a state law claim of tortious interference with a contractual relationship. KCS claims SD has no standing to assert a federal antitrust action and that any anti-competitive activity KCS may have committed is protected by the *Noerr–Pennington* doctrine. *See infra* note 23. KCS also asserts that the contract between SD and Energy Transportation Systems, Inc. (ETSI), cannot be the basis for recovery under either an antitrust or a tort theory because the contract was invalid. KCS further appeals other issues relating to the jury instructions, the statute of limitations, personal jurisdiction, venue, and the entry of judgment. The State of South Dakota cross-appeals the trial court's exclusion of its claim for lost tax revenues, failure to properly secure the judgment, and refusal to instruct the jury on certain theories. We reverse and dismiss the judgment on the antitrust claim for lack of standing. We further reverse

and dismiss the judgment on the tortious interference claim for reasons set forth in our opinion.

I. Background

Energy Transportation Systems, Inc., was created during the early 1970's for the purpose of constructing a pipeline through which coal could be transported from mining sites in north central states to utility companies in south central states. This project occurred in response to the energy crisis arising in the oil industry. ETSI, which was a joint venture composed of a number of large corporations,[3] intended to transport coal in "slurry" form. Coal slurry is a mixture of roughly half coal and half water. Consequently, large quantities of water were required to operate the pipeline.

ETSI initially proposed the Madison Formation Aquifer (Madison) as the source of water for the pipeline. The Madison is an enormous, mostly subterranean body of water which exists under several states including South Dakota and Wyoming. The State of South Dakota opposed this proposal on the grounds that the pipeline's use of Madison water would be detrimental to its environment and would deplete the water supply of residents in the western part of the state. ETSI nonetheless sought and received Madison water permits from Wyoming authorities.

The ETSI pipeline project also faced opposition from the railroad industry which opposed the construction of coal slurry pipelines generally. During the mid–1970's to the end of 1981, this opposition manifested itself in the railroads' refusal to grant ETSI permission to cross under existing railroad tracks. Crossing rights were fundamental to the construction of the pipeline since there was no way to build around the

---

[*] The HONORABLE GERALD W. HEANEY assumed senior status on December 31, 1988.

1. These parties will be jointly referred to hereafter as "KCS."

2. The plaintiffs who brought this action were the State of South Dakota and its Conservancy District, and will be jointly referred to hereafter

as "SD", "the State", or "the State of South Dakota."

3. The ETSI Pipeline Project was a joint venture created as a partnership under the laws of Delaware by and among Arcoal Transportation, Inc., Bechtel Petroleum, Inc., Lehman Realty Corporation, Slurco Corporation, and Texas Eastern Slurry Transport Company. KCS app. at 707.

railroads. ETSI was eventually forced to litigate for the right to cross under the tracks. After determining that the railroads' right-of-way interests stemmed from easements rather than from ownership in fee, ETSI purchased crossing rights from the abutting fee owners. ETSI then filed quiet title actions against the railroads. In defending these cases, the railroads pursued full exhaustion of their appellate remedies.[4] However, their efforts were to no avail. From the middle of 1976 to the end of 1981, ETSI prevailed in all of the more than sixty quiet title actions.

Well into this period of "window litigation,"[5] in the late 1970's, KCS and the other railroads determined that they would also oppose the ETSI pipeline project in the administrative forum. In order to construct the pipeline, ETSI was required to obtain a great number of permits and approvals from local, state, and federal agencies. The railroads focused their collective efforts in opposing the pipeline project in proceedings in which ETSI sought the various permits and approvals necessary for construction. Although they were participants in scores of administrative proceedings, the railroads' efforts were uniformly unsuccessful. KCS' most significant opposition related to the submission by ETSI of its Environmental Impact Statement (EIS). The railroads focused much of their resources toward criticism of this EIS with the intention of making the "environmental evaluation as difficult as possible * * * [and h]opefully, the State Agencies (with suggestions from Railroad people) could bog down the study with numerous statistical studies which we would hope to show would have an adverse effect on labor, local communities, and perhaps on other industries." SD supp. app. at 1001–02 (letter from W.A. Thie to Ed. Dudley, General Counsel, Oklahoma Railways Committee

(June 13, 1979)). The State of South Dakota also opposed ETSI in the EIS proceedings, labeling the project "inadequate and almost cavalier in its attitude and treatment of impacts to South Dakota" and advising the Department of the Interior (Interior) to order the redraft and recirculation of ETSI's proposed EIS. KCS app. at 540. South Dakota Governor William Janklow joined with the Governors of the States of Wyoming, Montana, and Nebraska to petition the Secretary of the Interior to delay the decision on ETSI. KCS app. at 790. Despite this opposition, the EIS process was completed in the early 1980's.

As previously stated, before late 1981 South Dakota also participated in opposition to the pipeline proposal in the administrative forum. This opposition was inspired by SD's concern that ETSI would use Madison water for the pipeline and thereby deprive residents of western South Dakota of their prime water source. For a long time, South Dakota had also opposed the use of water from the Oahe Reservoir. The Oahe Reservoir is a large body of water located in central South Dakota along the Missouri River. In 1975, Janklow, then SD's Attorney General, had officially concluded that South Dakota lacked authority to transfer or assign Oahe water rights. KCS app. at 774–786. Subsequently, a proposed sale of Oahe water by South Dakota was vetoed in 1977 by then-Governor Richard Kneip. KCS app. at 787–89.

South Dakota officials formally dropped their opposition on December 23, 1981, when the South Dakota Conservancy District (SDCD) executed an agreement with the ETSI Pipeline Project (SDCD/ETSI contract) in which ETSI agreed to use water from the Oahe Reservoir rather than from the Madison Formation. The SDCD/ETSI contract provided that the

---

**4.** A prime example of this tactic occurred in Oklahoma where KCS' rights-of-way existed through easements. Oklahoma law clearly disfavored KCS' position in resisting the quiet title actions. KCS nonetheless pursued the appeals of these cases in the spirit of its professed objective: "delay every way we can [ETSI's] obtaining permits or grants for construction of their lines * * * ." KCS app. at 645.

**5.** This phrase was coined to describe "gaps" in land ownership "where the railroads did not own their rights-of-way in fee but held instead only an easement interest." SD brief at 4. *See also In re Burlington Northern, Inc.*, 822 F.2d 518, 521 (5th Cir.1987).

SDCD would issue ETSI a permit to draw 50,000 acre-feet of Oahe water per year. SDCD did obtain such a permit with the aid of the legislature and subsequently transferred this permit to ETSI in February of 1982. In exchange for this permit, ETSI agreed to make payments to SDCD in the following manner: $2,000,000 upon the issuance of the permit; $2,000,000 if SDCD's authority to issue such a permit was unchallenged or, if challenged, was affirmed by the state's courts; $3,000,000 on the anniversary of the issuance of the permit and every anniversary thereon until construction of the pipeline was commenced; $9,000,000 upon commencement of construction; and every year thereafter, for fifty years, payments based on an amount adjusted according to the Fixed–Weighted Price Index for the Gross National Product.[6] Additionally, ETSI agreed to pay SDCD $1,500,000 if the West River Aqueduct, which was the pipeline that would carry Oahe water from central South Dakota to Wyoming, was not constructed on or before July 1, 1984. As part of the agreement, residents of western South Dakota would be allowed to tap water for their own consumption from the West River Aqueduct. ETSI retained the right to cancel this contract on thirty days notice where there was pending litigation or *if it intended to abandon the pipeline project,* and on sixty days notice if it intended to secure an alternative water source. If ETSI did not invoke its cancellation rights, this contract had a potential term of fifty years following completion of the pipeline.

On July 2, 1982, the ETSI Pipeline Project and the Department of the Interior, through the Bureau of Reclamation (BOR), executed a contract which authorized ETSI to withdraw at least 20,000 acre-feet of water annually from the Oahe Reservoir (BOR/ETSI contract). The States of Iowa, Missouri, and Nebraska, as well as KCS and several additional interested parties, filed an action to enjoin the contract and sought a declaration that Interior officials violated several federal statutes by their execution of the ETSI contract. The United States District Court for the District of Nebraska permanently enjoined the BOR/ETSI contract on the ground that Interior was not empowered to furnish Oahe water for industrial use. *Missouri v. Andrews,* 586 F.Supp. 1268, 1281 (D.Neb. 1984). In reaching its conclusion, the court interpreted the Flood Control Act of 1944, 33 U.S.C. §§ 701–1–709b (1982 & Supp. 1986), to mean that the Army Corps of Engineers (Corps) was to build, operate, and control main stem reservoirs while the Department of the Interior, through the Bureau of Reclamation, was to build, operate, and control the irrigation works attached to those reservoirs. *Andrews,* 586 F.Supp. at 1277. With respect to the Oahe Reservoir, the district court found no evidence that demonstrated specific storage space assigned to irrigation, much less any authority granted to Interior to use or assign Oahe water for a nonirrigation purpose such as industrial projects. *Id.* This court affirmed the district court's decision. *Missouri v. Andrews,* 787 F.2d 270, 287 (8th Cir.1986). Ultimately, *Andrews* was affirmed by the United States Supreme Court. *ETSI Pipeline Project v. Missouri,* 484 U.S. 495, 108 S.Ct. 805, 98 L.Ed.2d 898 (1988). The Court expressly noted, however, that it did not pass on "the relative interests of the United States and South Dakota in Lake Oahe water." *Id.* 108 S.Ct. at 808 n. 2.

---

6. The payments were to be made in accordance with the following formula:

$A = 0.5 \ B(1 + (C/D))$ where

A = amount of payment, provided that no payment shall ever be less than the immediately preceding payment.

B = Nine Million Dollars ($9,000,000) for the second payment under this Paragraph A.4., and thereafter the immediately preceding payment under this Paragraph A.4.

C = the Fixed–Weighted Price Index for the Gross National Product for the latest available calendar year at the time of payment for which the Index has been published in the "Survey of Current Business" (or successor publication).

D = the Fixed–Weighted Price Index for the Gross National Product for the calendar year immediately preceding the calendar year applicable to "C", above.

KCS app. at. 663.

Soon after the district court permanently enjoined the BOR/ETSI contract in May of 1984, South Dakota refused a request by ETSI to postpone contract payments. On July 31, 1984, ETSI, describing the opposition by the railroads as insurmountable, announced its decision to terminate the pipeline project and exercised its unilateral power to cancel its at-will contract with SDCD. Later that year, ETSI attempted to renegotiate an agreement but again South Dakota refused. On May 28, 1985, South Dakota filed an amended complaint[7] against KCS in federal district court asserting federal antitrust violations of sections 1[8] and 2[9] of the Sherman Act and a pendant state claim of tortious interference with a contractual relationship. Motions to dismiss for lack of personal jurisdiction, improper venue,[10] and lack of standing

filed by KCS were all denied by the district court. On April 8, 1988, following a ten week trial, the jury awarded the State of South Dakota $200,000,000 on the federal antitrust claim, which the court trebled, and $244,200,000 on the state law tortious interference with a contractual relationship claim.

## II. Antitrust Standing

The district court[11] found that the State of South Dakota had standing to sue KCS.

> [T]he harm to [South Dakota] was clearly foreseeable, and indeed is a necessary step in effecting the ends of the alleged conspiracy. Under the holding of [Blue Shield of Virginia v.] McCready [,457 U.S. 465, 102 S.Ct. 2540, 73 L.Ed.2d 149 (1982),] such an integral aspect of the alleged conspiracy is unquestionably the

---

7. The original complaint had been filed on March 16, 1983. On January 9, 1984, KCS moved to dismiss the original complaint for lack of standing. This motion was granted in part and denied in part on July 26, 1984. *See infra* note 18. Those plaintiffs who served in a capacity as *parens patriae* were dismissed. The district court, the Honorable Andrew W. Bogue presiding, held that:

> The State is not in the coal transportation business, and the Court sees no argument relating to harm to the State which would result from lack of competition in coal transportation. That claim belongs to ETSI. ETSI is not a party to this action. *Therefore, the State's claim to anti-trust damages hinges on its demand for damages resulting from Defendants' alleged unlawful interference with the contract for sale of water.*

*Janklow v. Kansas City Southern Indus., Inc.,* No. 83–5046, slip op. at 15 (D.S.D. July 26, 1984) (emphasis added).

8. 15 U.S.C. § 1 (1982).

9. 15 U.S.C. § 2 (1982). South Dakota also asserted state antitrust violations of S.D. Codified Laws Ann. §§ 37–1–3.1 *et seq.* This claim, however, was not submitted to the jury.

10. In originally deciding these issues, the district court interpreted 15 U.S.C. § 22 (1982) to permit both personal jurisdiction and venue in this case. *Janklow v. Kansas City Southern Indus., Inc.,* No. 83–5046, slip op. at 5 (D.S.D. Sept. 1, 1983) (Bogue, J.). Section 22 states:

> Any suit, action, or proceeding under the antitrust laws against a corporation may be brought not only in the judicial district whereof it is an inhabitant, but also in any district wherein it may be found or transacts busi-

ness; and all process in such cases may be served in the district of which it is an inhabitant, or wherever it may be found.

The district court stated that "[s]ince Congress provided for nationwide service of process over both Defendants, it intended that the Court would have the authority to enforce a judgment over those same defendants. Accordingly, the Court holds that it does have personal jurisdiction over both Defendants." *Janklow,* No. 83–5046, slip op. at 8. However, the application of section 22's "provision for extra-territorial service must *in every case* satisfy constitutional due process principles. Satisfaction of the requisite due process standards are [sic] tested by the familiar 'minimum contacts' analysis of *International Shoe* and its progeny." *Reynolds Metals Co. v. Columbia Gas Sys., Inc.,* 694 F.Supp. 1248, 1250 (E.D.Va.1988) (original emphasis). The district court provided a detailed consideration of KCS' contacts with South Dakota in its determination of the venue issue. These contacts included the fact that KCS had injected itself, either directly or indirectly, into a number of state administrative proceedings, that at least three KCS employees are regularly dispatched to make sales calls in South Dakota, that as the result of its operation as a common carrier KCS received approximately $309,000 in revenue from shipments originating from or terminating in South Dakota in 1982, and that KCS has provided 28 of its locomotives to Burlington Northern for its regular use in South Dakota. *Janklow,* No. 83–5046, slip op. at 11–12. We believe that these contacts are sufficient to support the district court's finding of personal jurisdiction and venue in this case.

11. The Honorable John B. Jones, United States District Judge for the District of South Dakota.

sort of direct injury which the antitrust laws were intended to redress.

*Janklow v. Kansas City Southern Indus., Inc.,* No. 83–5046, slip op. at 7 (D.S.D. Mar. 6, 1986). We respectfully disagree with the district court's conclusion that the State of South Dakota has standing to raise federal antitrust claims in this case.

In *Blue Shield of Virginia v. McCready,* 457 U.S. 465, 102 S.Ct. 2540, 73 L.Ed.2d 149 (1982), a subscriber brought an action under section 1 of the Sherman Act attacking the practice of a group health plan which denied reimbursement for psychotherapy performed by psychologists but permitted reimbursement for comparable treatment when rendered by psychiatrists. The Court held that the proper analysis required examination of (1) "the physical and economic nexus between the alleged violation and the harm to the plaintiff" and, *more particularly,* (2) "the relationship of the injury alleged with those forms of injury about which Congress was likely to have been concerned in making defendant's conduct unlawful and in providing a private remedy under § 4." *Id.* at 478, 102 S.Ct. at 2548. In applying the first criterion, the Court found that McCready's injury was neither "fortuitous" nor "incidental." *Id.* The harm was "clearly foreseeable; indeed, it was a necessary step in effecting the ends of the alleged illegal conspiracy." *Id.* at 479, 102 S.Ct. at 2548. The Court further found that, *as a consumer* of psychotherapy services entitled to reimbursement

under the group health plan, "McCready was within that area of the economy … endangered by [that] breakdown of competitive conditions' * * *." *Id.* at 480–81, 102 S.Ct. at 2548–49 (quoting *In re Multidistrict Vehicle Air Pollution M.D.L. No. 31,* 481 F.2d 122, 129 (9th Cir.1973)). Turning to the second and more significant criterion, the Court found that as a result of an anticompetitive scheme, McCready, although not a competitor, suffered injuries that were "inextricably intertwined with the injury the conspirators sought to inflict" on the market. *Id.* at 484, 102 S.Ct. at 2551.[12]

One year after *McCready* was decided, in *Associated General Contractors of Calif., Inc. v. California State Council of Carpenters,* 459 U.S. 519, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983), the Supreme Court again addressed the topic of standing when a number of labor unions alleged that a multiemployer association coerced its members and certain third parties to do business with nonunion firms. While noting the difficulty in clearly stating standards for determining standing and comparing the level of difficulty of such a task to the articulation of a standard that adequately contains the concept of proximate cause,[13] the Court discussed several factors relevant to determining whether a party has standing to raise federal antitrust claims: (1) the causal connection between the alleged antitrust violation and the harm to the plaintiff; (2) the existence of an im-

---

12. Blue Shield argued that McCready could not have standing by virtue of *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.,* 429 U.S. 477, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977), because her injury " 'did not reflect the anticompetitive effect' " of the alleged violation. *McCready,* 457 U.S. at 482, 102 S.Ct. at 2550. The Court did not accept this interpretation:

> *Brunswick* is not so limiting. Indeed, as we made clear in a footnote to the relied-upon passage, a § 4 plaintiff need not "prove an actual lessening of competition in order to recover. [C]ompetitors may be able to prove antitrust injury before they actually are driven from the market and competition is thereby lessened."

*Id.* (quoting *Brunswick,* 429 U.S. at 489 n. 14, 97 S.Ct. at 698 n. 14).

13. The Court observed that:

> There is a similarity between the struggle of common-law judges to articulate a precise definition of the concept of "proximate cause," and the struggle of federal judges to articulate a precise test to determine whether a party injured by an antitrust violation may recover treble damages. It is common ground that the judicial remedy cannot encompass every conceivable harm that can be traced to alleged wrongdoing. In both situations the infinite variety of claims that may arise make it virtually impossible to announce a black-letter rule that will dictate the result of every case. Instead, previously decided cases identify factors that circumscribe and guide the exercise of judgment in deciding whether the law affords a remedy in specific circumstances.

*Associated General,* 459 U.S. at 535–37, 103 S.Ct. at 907–08 (footnotes omitted).

proper motive; (3) whether the injury was of a type that Congress sought to redress with the antitrust laws; (4) the directness of the connection between the injury and the alleged restraint in the relevant market; (5) the speculative nature of the damages; and (6) the risk of duplicative recoveries or complex apportionment of damages. *Id.* at 537–45, 103 S.Ct. at 908–12.

■ With regard to the first *Associated General* factor, it can be argued that South Dakota's injuries were in some way causally connected to KCS' allegedly anticompetitive conduct. However, as the Supreme Court has observed, the determination of whether there is antitrust standing is similar to the determination of whether there is proximate cause. *Associated General,* 459 U.S. at 535–37, 103 S.Ct. at 907–08; *McCready,* 457 U.S. at 477, 102 S.Ct. at 2547. "[A] mere causal connection between an antitrust violation and harm to a plaintiff cannot be the basis for antitrust compensation unless the injury is directly related to the harm the antitrust laws were designed to protect." *McDonald v. Johnson & Johnson,* 722 F.2d 1370, 1374 (8th Cir.1983) (citing *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.,* 429 U.S. 477, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977)). Furthermore, for the purposes of our analysis, we grant the assumption that KCS' activities were improperly motivated.[14] *Alberta Gas Chems. Ltd. v. E.I. Du Pont de Nemours & Co.,* 826 F.2d 1235, 1241 (3d Cir.1987); *McDonald,* 722 F.2d at 1374. This enables us to address the factor which both *McCready* and *Associated General* seem to consider paramount: whether SD's injuries were of a type that Congress sought to redress with the antitrust laws.

Without a doubt ETSI, as a competitor in the coal transportation market, and the participating utilities in the south central states, as consumers of that coal, have standing to raise antitrust claims against KCS. *See Pinney Dock & Transp. Co. v. Penn Central Corp.,* 838 F.2d 1445, 1464 (6th Cir.1988) (*Associated General* factors include existence of more direct victims); *Adams v. Pan American World Airways, Inc.,* 828 F.2d 24, 29–30 (D.C.Cir.1987) (existence of superior plaintiffs who have reached settlements sufficiently vindicate public interest). These parties were obviously participants in the coal transportation market and have been the most directly affected by KCS' actions.[15] South Dakota claims that, although it was not a consumer or a competitor,[16] it too was a participant in the relevant market. Essentially, SD maintains that it was constructively a member of the ETSI joint venture because it played

**14.** We, however, express the caveat that "an allegation of improper motive * * * is not a panacea that will enable any complaint to withstand a motion to dismiss." *Associated General,* 459 U.S. at 537, 103 S.Ct. at 908 (footnotes omitted).

**15.** These parties have in fact brought suit. Thus KCS' alleged anticompetitive activity has been attacked by market participants. ETSI and a number of the utilities have brought suit against the railroads in the United States District Court for the Eastern District of Texas. *ETSI Pipeline Project v. Burlington Northern, Inc.,* No. B–84–979CA. KCS has since reached a settlement with the plaintiffs and has been released as a defendant in that case.

**16.** The antitrust laws "were enacted for 'the protection of *competition,* not *competitors.*'" *Brunswick,* 429 U.S. at 488, 97 S.Ct. at 697 (quoting *Brown Shoe Co. v. United States,* 370 U.S. 294, 320, 82 S.Ct. 1502, 1521, 8 L.Ed.2d 510 (1962) (original emphasis)). This does not mean that the statute confines its protection solely to consumers, competitors, buyers, and sellers. *McCready,* 457 U.S. at 472, 102 S.Ct. at 2544 (quoting *Mandeville Island Farms, Inc. v. American Crystal Sugar Co.,* 334 U.S. 219, 236, 68 S.Ct. 996, 1006, 92 L.Ed. 1328 (1948)). *See also Southhaven Land Co. v. Malone & Hyde, Inc.,* 715 F.2d 1079, 1086 (6th Cir.1983) (finding that plaintiff is not direct participant in relevant market not dispositive of section 4 standing issue). *But see General Indus. Corp. v. The Hartz Mountain Corp.,* 810 F.2d 795, 809 (8th Cir.1987) (citing *Associated General,* 459 U.S. at 539, 103 S.Ct. at 909). Standing determinations must be made on a case by case basis. *Pocahontas Supreme Coal Co. v. Bethlehem Steel Corp.,* 828 F.2d 211, 219 (4th Cir.1987); *Los Angeles Memorial Coliseum Comm'n v. National Football League,* 791 F.2d 1356, 1363 (9th Cir. 1986); *Crimpers Promotions, Inc. v. Home Box Office, Inc.,* 724 F.2d 290, 293 (2d Cir.1983). Nevertheless, the fact that a party is not a participant in the relevant market must be weighed heavily against a grant of standing. *Lucas v. Bechtel Corp.,* 800 F.2d 839, 844 (9th Cir.1986). *See also Feeney v. Chamberlain Mfg. Corp.,* 831 F.2d 93, 96 (5th Cir.1987); *Eagle v. Star–Kist Foods, Inc.,* 812 F.2d 538, 540 (9th Cir.1987).

a vital role in procuring a source of water for the pipeline. KCS, of course, claims that SD was at best a supplier existing completely outside the coal transportation market. Resolution of this dispute requires a close examination of the State of South Dakota's involvement in the ETSI pipeline project.

During the early stages of the project, the State of South Dakota had vigorously opposed the pipeline project because the proposed use of Madison water threatened to deprive residents of western South Dakota of their water source. Furthermore, until 1981, SD even opposed use of Oahe water in the coal slurry pipeline. In late 1981, however, the State of South Dakota and ETSI entered into negotiations in which the State proposed to assign its rights in Oahe water in exchange for an annual fee and the distribution of a portion of that water from the West River Aqueduct. ETSI officials faced the following choice: confront South Dakota's continuing opposition by using Madison water for which Wyoming had already granted permits or enjoy South Dakota's cooperation and assistance by using Oahe water.

Eventually, ETSI decided to use Oahe water. In order to facilitate this decision, the South Dakota legislature enacted a statute authorizing the South Dakota Conservancy District to market water for energy industry use. 1981 S.D.Laws HB 1002 (amendments to S.D.Codified Laws Ch. 46–1 et seq.). On December 23, 1981, the SDCD entered into an agreement with ETSI to assign a water right to energy industry use. In the SDCD/ETSI contract, SDCD accepted responsibility "for securing the issuance of the Oahe Permit from the [South Dakota] Water Management Board." KCS app. at 657. The SDCD/ETSI contract placed responsibility for obtaining federal permission to use

Oahe water on ETSI. SDCD, however, agreed to "assist and cooperate with ETSI in securing such permission." *Id.* at 669.

■ As the district court had earlier ruled, South Dakota was not an actual participant in the coal transportation market. *See supra* n. 7. We find that, for purposes of the alleged antitrust injury, the State did nothing more than make an assignment of its rights in Oahe water.[17] Traditionally, suppliers of competitors in the relevant market have been denied standing because any alleged injury is considered derivative of the harm sustained by the competitor. L. Sullivan, *Handbook of the Law of Antitrust* § 247, at 773 & n. 11 (1977). Because the antitrust laws were intended to protect competition, standing has been generally limited to the actual participants in the relevant market: competitors and consumers. Suppliers are allowed standing only if they were directly involved in the market. *Compare Volasco Prods. Co. v. Lloyd A. Fry Roofing Co.*, 308 F.2d 383, 393–95 (6th Cir.1962) (supplier of raw materials to asphalt manufacturer denied standing) *with South Carolina Council of Milk Producers, Inc. v. Newton*, 360 F.2d 414, 418 (4th Cir.1966) (standing granted to milk producers who provided essentially the same commodity as homogenized milk eventually sold in market) *and Karseal Corp. v. Richfield Oil Corp.*, 221 F.2d 358, 362–65 (9th Cir.1955) (manufacturer of finished product as it eventually entered market through distributors deemed to have standing). *See also* 2 P. Areeda & D. Turner, *Antitrust Law* §§ 340a–340b (1978); L. Sullivan, *supra* § 247.

■ SD's interest in the success of the coal slurry pipeline was limited to the receipt of annual payments from ETSI in exchange for the assignment of its rights to draw water from the Oahe Reservoir.[18]

---

**17.** KCS and the State of South Dakota have engaged in extensive debates over whether SD was even a "supplier," i.e., whether the State had any legal interest in the water it purported to sell or assign, or if the Corps of Engineers had exclusive authority to make such an assignment. *See infra* discussion at note 28. We decide the standing issue on the antitrust claim without reaching this issue. We simply assume

for the purposes of our discussion on standing that SD did have Oahe water rights to assign to ETSI.

**18.** When this lawsuit was originally filed, motions were heard by the Honorable Andrew W. Bogue, then Chief Judge, United States District Court for the District of South Dakota. Judge Bogue found that state officials had no standing

At the time of cancellation, SD had already received over $5,000,000 under the terms of the contract. However, as significant as the continuance of the payments was, this contractual relationship does not mirror the type of interest a participant has in maintaining competition in the coal transportation market.

The State of South Dakota's interest is most directly tied to decisions made by the ETSI pipeline project authorities and, although the fate of the at-will contract that existed between ETSI and SD may have been influenced indirectly by activities in the coal transportation market, the State's interest does not constitute the interest of a competitor in the coal transportation market. Similarly, as the case law makes clear, SD's role as a supplier does not create such a symbiotic relationship with ETSI that its situation is "inextricably intertwined with the injury" to the relevant market. *McCready*, 457 U.S. at 484, 102 S.Ct. at 2551. The State's role in providing opposition against ETSI prior to December, 1981, does not reflect the actions of a partner in the coal slurry pipeline project. Furthermore, supplying water for the slurry pipeline does not place SD in the coal transportation market.

The State of South Dakota's cross-appeal alleges that it was a participant in the "water rights market for coal slurry pipelines." The existence or nonexistence of a water rights market for coal slurry pipelines does not change the fact that the State was not a participant in the coal transportation market. However, even assuming that SD has proven the existence of a water rights for coal slurry pipelines market, KCS was not a participant in that market. Furthermore, the fact that ETSI needed and contracted for water as a raw material to transport coal does not by any means place the pipeline project in competition with those parties who sold water rights.[19] SD's competitors in the water rights market are limited to those entities that were ready, willing, and able to sell the quantity of water needed to operate a coal slurry pipeline.

Although the State of South Dakota was allegedly injured by KCS' anticompetitive behavior, its injuries did not result from the anticompetitive nature of these practices. *Brunswick*, 429 U.S. at 489, 97 S.Ct. at 697; *Gregory Mkg. Corp. v. Wakefern Food Corp.*, 787 F.2d 92, 95–96 (3d Cir. 1986). The State's injuries were "purely an incidental result of anti-competitive activity in another segment of the economy * * *." *Comet Mechanical Contractors, Inc. v. E.A. Cowen Constr., Inc.*, 609 F.2d 404, 407 (10th Cir.1980). The loss of future revenues clearly flowed from the cancellation of the contract rather than from injury to competition in the market in which it was involved. *Gregory*, 787 F.2d at 96. *See also Pocahontas Supreme Coal Co. v. Bethlehem Steel Corp.*, 828 F.2d 211, 219–20 (4th Cir.1987); *Larry R. George Sales Co. v. Cool Attic Corp.*, 587 F.2d 266, 272

to bring a *parens patriae* suit on behalf of the citizens of South Dakota who had been deprived of a potential source of potable water from the proposed West River Aqueduct. Such an injury was deemed too remote from the alleged anticompetitive activities. *Janklow v. Kansas City Southern Indus., Inc.*, No. 83–5046, slip op. at 14 (D.S.D. July 26, 1984). Thus, the sole injury alleged by SD was the loss of revenue that it would have received but for the cancellation of the SDCD/ETSI contract. *Id.* at 15.

**19.** At trial Dr. John Beyer testified that SD was a participant in the coal transportation market in the same way in which the Atomic Energy Commission (AEC) had been a participant in the uranium market due to AEC's position as the sole source for uranium enrichment. In essence, this argument states that a supplier can be so unique and vital to production that its interests are the same as the interests of those competitors who are actually in the market. We do not believe that this model applies to this case. The enrichment of uranium necessarily involves a manufacturing process. *Huffman v. Western Nuclear, Inc.*, 486 U.S. 663, 108 S.Ct. 2087, 2088 n. 2, 100 L.Ed.2d 693 (1988). As our previous discussion illustrates, suppliers who are essentially manufacturers of a finished product are certainly more than mere suppliers. Coal slurry, on the other hand, simply describes a transportation process which in no way alters the natural composition of the material that is being transported. The supplier of the water may in no way be deemed to be the manufacturer of the coal in the way that the AEC was the manufacturer of enriched uranium. The supplier of the water is instead just one supplier of the many components involved in the proposed pipeline transportation of the coal.

(5th Cir.1979). It is evident that South Dakota would have suffered an identical loss in the event that the railroads had done nothing and ETSI had simply decided to terminate the SDCD/ETSI contract for some other reason.[20] *McDonald,* 722 F.2d at 1376–77. Its injuries are connected to the cancellation of the contract which is necessarily an indirect effect of the alleged anticompetitive behavior. Consequently, we find that there was no proximate causation between the alleged market restraint and the harm sustained by SD. *McDonald,* 722 F.2d at 1374 (footnote omitted). *See also Sundance Land Corp. v. Community First Fed. Sav. & Loan Ass'n,* 840 F.2d 653, 660 (9th Cir.1988). We hold that the State of South Dakota did not suffer an injury which could be characterized as a type that Congress sought to redress by enacting sections 1 and 2 of the Sherman Act.[21] Consequently, we hold that the State of South Dakota has no standing to sue KCS for alleged antitrust violations.

## III. State Law Claim for Intentional Interference with Contractual Relationship

In addition to its verdict for the State of South Dakota on the antitrust claim, the jury awarded $244,200,000 on SD's state law claim of intentional interference with a contractual relationship. This amount is composed of the sum of $200,000,000 in actual damages; $10,900,000 in loss of sales, use, and contractor's excise tax that would have been generated from construction of the West River Aqueduct; $8,300,-000 in prejudgment interest; and $25,000,-000 in punitive damages.

The relationship with which KCS allegedly interfered was based on the SDCD/ETSI contract. The State argues that but for KCS' petitioning activities against ETSI, the pipeline project would have proceeded and South Dakota would have reaped the full worth of its contract with ETSI. KCS, relying on the provisions of the Flood Control Act,[22] contends that there was not a valid contractual relationship which could have been interfered with because South Dakota did not have any water rights in the Oahe water to assign. Although the use of the surplus water within the Oahe Dam was the essential ingredient and sole purpose of the contract, KCS overlooks the fact that the contract provided other benefits to ETSI (for which it has paid substantial consideration). Additionally, South Dakota promised its cooperation and assistance to ETSI in securing a water source. The use of Madison water involved a number of potential difficulties, not the least of which would have included South Dakota's opposition. Furthermore, ownership and control as between state and federal authorities over Oahe water was far from settled. Under the contract, the State not only ended its opposition to the pipeline but in fact agreed to use whatever power it had to assist ETSI's efforts

---

**20.** Although ETSI's professed reasons for terminating the SDCD/ETSI contract related to the resources necessary to deal with the railroads' opposition, the record contains a number of different factors which hastened the end of the coal slurry pipeline project. These factors include the decline in the price of oil, the deregulation of the railroad industry, and the remaining federal, state, and local agency authorization that ETSI had yet to obtain. A significant hurdle which yet remained involved securing authorization for use of Oahe water from the Army Corps of Engineers.

**21.** This finding alone is sufficient to bar standing because where there is no antitrust injury there can be no entitlement to damages. *Midwest Communications, Inc. v. Minnesota Twins, Inc.,* 779 F.2d 444, 450 (8th Cir.1985). Moreover, this finding of course obviates the need to consider KCS' contention that SD's antitrust

claim should have been dismissed because the statute of limitations had run.

**22.** Section 708 of the Flood Control Act states:

**Sale of surplus waters for domestic and industrial uses; disposition of moneys**

The Secretary of the Army is authorized to make contracts with States, municipalities, private concerns, or individuals, at such prices and on such terms as he may deem reasonable, for domestic and industrial uses for surplus water that may be available at any reservoir under the control of the Department of the Army: *Provided,* That no contracts for such water shall adversely affect then existing lawful uses of such water. All moneys received from such contracts shall be deposited in the Treasury of the United States as miscellaneous receipts.

33 U.S.C. § 708 (1982).

to secure permission to use Oahe water from the federal authorities.

This court has observed that "South Dakota seems to have adopted the Restatement (Second) as its statement of the tort of interference with contractual relations." *Cutter v. Lincoln Nat'l Life Ins. Co.*, 794 F.2d 352, 356 (8th Cir.1986) (citing *Johnson v. Schmitt*, 309 N.W.2d 838 (S.D.1981)). *See also Groseth Int'l, Inc. v. Tenneco, Inc.*, 410 N.W.2d 159, 172 (S.D.1987). The Restatement (Second) of Torts § 766B provides:

> One who intentionally and improperly interferes with another's prospective contractual relation (except a contract to marry) is subject to liability to the other for the pecuniary harm resulting from loss of the benefits of the relation, whether the interference consists of
>
> (a) inducing or otherwise causing a third person not to enter into or continue the prospective relation or
>
> (b) preventing the other from acquiring or continuing the prospective relation.

The factors to be considered in determining whether the interference was improper include:

> (a) the nature of the actor's conduct,
>
> (b) the actor's motive,
>
> (c) the interests of the other with which the actor's conduct interferes,
>
> (d) the interests sought to be advanced by the actor,
>
> (e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other,
>
> (f) the proximity or remoteness of the actor's conduct to the interference and
>
> (g) the relations between the parties.

Restatement (Second) of Torts § 767 (1979). For purposes of applying the Restatement (Second) of Torts, it is essential to acknowledge the fact that the contractual relationship in the instant case was terminable at will. "One's interest in a contract terminable at will is primarily an interest in future relations between the parties, and he has no legal assurance of them. For this reason, an interference with this interest is closely analogous to interference with prospective contractual relations." Restatement (Second) of Torts § 766 comment g (1979).

■ In the spirit contained in Restatement (Second) of Torts § 767(e), there are certain privileged activities which may result in interference of contractual relationships but which shall not incur liability. One such activity involves the first amendment right to petition the government for redress of grievances. The *Noerr–Pennington* doctrine [23] has been applied in evaluating whether this particular activity is entitled to protection from liability.[24] *Missouri v. National Org. for Women, Inc.*, 620 F.2d 1301, 1317–19 (8th Cir. 1980).[25] *See also Gorman Towers, Inc. v. Bogoslavsky*, 626 F.2d 607, 614–15 (8th Cir. 1980); *Surgidev Corp. v. Eye Technology, Inc.*, 625 F.Supp. 800, 802–05 (D.Minn. 1986); *First Nat'l Bank of Omaha v. The Marquette Nat'l Bank of Minneapolis*, 482 F.Supp. 514, 524–25 (D.Minn.1979). This exemption shall not apply, however, if the petitioning activities in question were

---

**23.** The *Noerr–Pennington* doctrine, which arose out of the United States Supreme Court's decisions in *Eastern R.R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961), and *United Mine Workers of Am. v. Pennington*, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965), exempts from the antitrust laws certain petitioning of courts and administrative agencies that results in anticompetitive effects. *California Motor Transp. Co. v. Trucking Unltd.*, 404 U.S. 508, 510, 92 S.Ct. 609, 611, 30 L.Ed.2d 642 (1972).

**24.** This same doctrine has been applied to other areas of litigation. *See, e.g., Bill Johnson's Restaurants, Inc. v. NLRB*, 461 U.S. 731, 103 S.Ct.

2161, 76 L.Ed.2d 277 (1983) (unfair labor practices); *Hufsmith v. Weaver*, 817 F.2d 455 (8th Cir.1987) (antitrust).

**25.** Although *National Organization for Women* dealt with a political boycott, one of plaintiff's complaints alleged intentional infliction of harm without legal excuse. 620 F.2d at 1316. Moreover, the court cited the analysis in *Sierra Club v. Butz*, 349 F.Supp. 934 (N.D.Cal.1972) for support of its position. *Id.* at 1317. *Sierra Club* was a nonantitrust case which applied *Noerr–Pennington* to "interference with advantageous relationship" claims. *Sierra Club*, 349 F.Supp. at 938.

"sham" and in fact solely intended to cause injury to competitors rather than to obtain governmental action. *Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492, 108 S.Ct. 1931, 1937 n. 4, 100 L.Ed.2d 497 (1988). The "sham exception" shall apply where defendant's resort to the courts and agencies " 'is so clearly baseless as to amount to an abuse of process * * *.' " *Razorback Ready Mix Concrete Co. v. Weaver*, 761 F.2d 484, 487 (8th Cir. 1985) (quoting *Chest Hill Co. v. Guttman*, 1981–2 Trade Cas. (CCH) ¶ 64,417 (S.D. Ohio May 29, 1981)).

■ KCS' initial opposition to the ETSI coal slurry pipeline project involved its participation in defending the title actions beginning in the mid–1970's. The railroads failed to prevail in any of these actions. In the late 1970's, this "window litigation" began to wind down and was replaced by activity in the administrative forum. From that time until the early 1980's, KCS was involved in over thirty federal and state agency proceedings relating to the coal slurry pipeline. KCS' most significant effort in this regard involved its opposition to ETSI's proposed Environmental Impact Statement. As discussed earlier, KCS had been joined in this effort by the State of South Dakota until the SDCD/ETSI contract was executed in December, 1981.

To support its allegation of sham petitioning by KCS, SD points to the window litigation and administrative proceedings described above. Certainly the legitimacy of these activities is subject to debate. *See*

*In re Burlington Northern, Inc.*, 822 F.2d 518 (5th Cir.1987), *cert. denied sub nom. Union Pac. R.R. Co. v. Energy Transp. Sys., Inc.*, ⸺ U.S. ⸺, 108 S.Ct. 701, 98 L.Ed.2d 652 (1988).[26] However, we find that a determination of whether these pre-December, 1981, activities constitute sham petitioning is irrelevant to the issue of whether the State of South Dakota may raise a claim of improper interference with contractual performance. The SDCD/ETSI contract was not executed until December 23, 1981.' Consequently, regardless of whether KCS' conduct prior to that date can be characterized as sham, we are confined to consider only those activities that took place between December 23, 1981, and July 31, 1984: the period between the date of execution and date of termination of the SDCD/ETSI contract.[27]

During the period in which the contract was in effect, KCS continued to participate in a number of the administrative proceedings which had been commenced earlier in the decade. Again, its most prominent involvement related to the final stages of the EIS proceedings. These activities, however, were gradually being displaced by KCS' participation in the *Andrews* litigation which challenged ETSI's contract with the Bureau of Reclamation. The action for a permanent injunction barring performance of the BOR/ETSI contract was filed on August 18, 1982. The events in this case moved quickly and, on May 3, 1984, the United States District Court for the

---

**26.** In *Burlington Northern*, the Fifth Circuit reviewed ETSI's claims that the railroads had committed sham petitioning and therefore were not entitled to first amendment protection. The court held: "We believe that ETSI's claims, if found by the district court to be supported by prima facie evidence, are sufficient to deprive the railroads' defense of the window litigation of *Noerr–Pennington* protection." 822 F.2d at 532.

**27.** Indeed the trial court instructed the jury to this effect, to-wit, to consider only evidence in the tortious interference claim that occurred after KCS' knowledge of the contract. However, the trial court's blanket instruction to the jury, although not excepted to in this regard, submitted the question of sham petitioning without attempting to distinguish between the

alleged interference occurring before and after the date of the contract.

The state urges that the evidence of sham petitioning before the contract was entered into should be considered relevant to the intent of KCS in the post-contract period. Perhaps this was the reasoning behind the last paragraph in instruction 33 which did not attempt to distinguish between the pre-contract and post-contract period. We do not ignore the state's argument concerning intent in this regard. We rule, however, that the post-contract activity predominantly involved *Andrews* litigation and the opposition by the other states; as we discuss, *infra*, the railroad's interference or opposition was de minimus in the post-contract period and as a matter of law was not a direct cause to the cancellation of the contract.

District of Nebraska enjoined performance of the contract. *Missouri v. Andrews*, 586 F.Supp. 1268 (D.Neb.1984), *aff'd*, 787 F.2d 270 (8th Cir.1986), *aff'd sub nom. ETSI Pipeline Project v. Missouri*, 484 U.S. 495, 108 S.Ct. 805, 98 L.Ed.2d 898 (1988). The record leaves little dispute that the district court's decision in *Andrews* was the single most important event immediately preceding the termination of the ETSI coal slurry pipeline project. Similarly, the record makes clear that, in examining KCS' overall activities between late-1981 and mid-1984, the *Andrews* litigation was by far the dominant component of those activities.

Indeed, roughly one-third of the administrative actions mentioned above were directly related to the *Andrews* litigation.

We need not reach KCS' claim that the State's contract was null and void because only the Corps of Engineers could contract for the use of the water.[28] We hold as a matter of law that KCS' activities following December, 1981, in opposing the pipeline (1) had no significant or proximate causal relation to the cancellation by ETSI of the SDCD/ETSI contract and, even if they did contribute to the cancellation of the contract, (2) KCS' activities in the *Andrews*

**28.** Although we do not pass on this issue, it is clear that a condition precedent to future performance of the SDCD/ETSI contract required that ETSI obtain a contract with the Army Corps of Engineers to use the water in the Oahe dam. The statute, 33 U.S.C. § 708, and the decisions in the *Andrews* litigation, make this condition clear. It is our impression that obtaining the contract from the Corps was a condition in fact for any future payment by ETSI to SD. The record, however, is silent as to whether the Corps' approval was obtainable.

In the absence of such proof we think it clear that plaintiff's alleged damages are entirely speculative and not supported by substantial evidence. Dr. Ralph J. Brown, the economic expert retained by South Dakota to testify regarding damages, altogether ignored the possibility that ETSI could have invoked the cancellation rights (as it eventually did) in any of a number of situations. Dr. Brown instead treated the SDCD/ETSI contract as if it were a promissory note. He assumed that construction of the pipeline would commence on April 1, 1986, and be completed by June 1, 1988. From the date of the actual cancellation of the contract to Brown's projected date for the pipeline completion, he testified that SDCD would receive payments totaling $24,100,000. Brown further testified that SDCD would subsequently receive $9,000,000 annually for the next fifty years. Brown added these annual payments to the future sales tax payments that would have accompanied maintenance of the West River Aqueduct, adjusted the entire sum for three percent inflation, and reached a present value amount of $210,900,000.

The most important consideration relating to the determination of damages in this case is the fact that the SDCD/ETSI contract was terminable at ETSI's will if certain events should occur. Restatement (Second) of Torts § 766 comment g ("The fact that the contract is terminable at will * * * is to be taken into account in determining the damages that the plaintiff has suffered by reason of its breach."). First, should the pipeline project be abandoned, ETSI could terminate the contract on thirty days notice.

Even if ETSI were able to attain the Corps' permission to use Oahe water, the project still faced a number of obstacles in each of the seven states through which the pipeline was to pass. Perhaps ETSI had secured the necessary rights-of-way to avoid further window litigation with the railroads. Nonetheless in each of these states ETSI would have to respond to concerns that include the pipeline's impact on the environment, compliance with safety regulations, effect on the local work force, and proper zoning of the land through which the pipeline would pass. Success in these matters would require cooperation on the part of each state just as obtaining a water source required a great deal of cooperation from South Dakota authorities. In addition, succeeding occurrences in the economy such as the decline of inflation and a severe decrease in oil prices certainly made the coal slurry pipeline project a much less lucrative investment. Moreover, the economic experts at trial testified that the deregulation of the transportation industry virtually assured a market situation in which the railroads could transport coal at lower rates than a coal slurry pipeline.

Furthermore, we find it entirely speculative that construction of the pipeline would commence by the middle or even late 1980's. In fact, KCS presented unrefuted testimony by its economic experts that the drastic economic changes and the deregulation of the railroad industry which occurred in the early 1980's made a coal slurry pipeline project infeasible.

The record also reflects that, following the district court's decision to enjoin the BOR/ETSI contract, ETSI found it necessary to exercise its right to cancel the SDCD/ETSI contract because SD refused to postpone the payment of fees under the contract. We find that under the circumstances reflected by the record, the only factor that could have prolonged the existence of the contract would have been a decision on SD's part to postpone the payment by ETSI of fees owed under the SDCD/ETSI contract. We therefore find that the jury's award of damages is in no way supported by substantial evidence in the record.

litigation were protected by the *Noerr–Pennington* doctrine.

First, we find that the successful *Andrews* litigation which enjoined the BOR/ETSI contract for use of the Oahe water never involved the formal adjudication of whether KCS had standing to participate as a party in the litigation. Although the district court originally held KCS did not have standing, it thereafter vacated its order and held that in the interests of judicial economy the court would "reserve a decision on standing until one needs to be made." SD brief at 29 n. 21. This court, in affirming the permanent injunction of the contract, held that the issue of KCS' standing was "superfluous." *Missouri v. Andrews*, 787 F.2d at 274. Thus the *Andrews* litigation which brought the pipeline project to a sudden halt was successful through the efforts of the various plaintiff states: Missouri, Iowa, and Nebraska. The efforts to obtain standing by KCS were *de minimis* as a matter of law and at best only remotely related to ETSI's withdrawing from the contract. This determination renders KCS' motive in pursuing its right to join in the suit irrelevant. Furthermore, any impropriety in KCS' efforts to obtain standing was mooted by the successful litigation of the named party plaintiffs. In so holding, we do not overlook situations in which a party might unreasonably assert standing, and in which such conduct could be deemed harassment as a matter of fact and would therefore be unprotected by the *Noerr–Pennington* doctrine. *See* Comment, *Meritorious Litigation as a Section 2 Violation—In re Burlington Northern, Inc. Broadens Noerr–Pennington's Sham Exception*, 74 Iowa L.Rev. 271, 278 (1988).[29] However, KCS' efforts were formally aborted and they were not one of the successful parties. Their efforts to become formal parties in the litigation to enjoin the SDCD/ETSI contract, successful or unsuccessful as they may have been, could hardly be deemed a proximate cause of ETSI's decision to terminate the contract.

In *In re Burlington Northern, Inc.*, 822 F.2d 518 (5th Cir.1987), the Union Pacific Railroad, although not a formal party in *Andrews*, was found to have assisted the State of Nebraska in the litigation. 822 F.2d at 530–32. Assuming the record would support a similar factual finding with regard to KCS in the present case, we move to the second ground of our holding: KCS' participation in the *Andrews* litigation did not, as a matter of law, constitute "sham" petitioning and was fully protected by the first amendment.

South Dakota urges this court to adopt the reasoning contained in *Burlington Northern*. In *Burlington Northern*, the Fifth Circuit was asked to review the district court's denial of a discovery motion in an antitrust action brought against the railroads by ETSI and the southern utility companies. The court, which considered all of the petitioning done by the railroads from the mid–1970's until the mid–1980's, found that the totality of these activities could constitute "sham." It remanded the case for further findings relating to the petitioners' subjective intent so as to determine whether the actual desire for relief was a significant factor in the underlying petitioning. *Id.* at 534. So long as such a desire existed, the issue of whether the petitioners also possessed anticompetitive motives is irrelevant. *Id.* at 528. Thus, SD argues that even if the petitioning in question is successful there nonetheless remains a factual question as to whether the petitioner's subjective intent was solely to harass and interfere with a defendant's business relationship, or whether the petitioner possessed an actual desire and a justifiable expectation for judicial relief. Comment, *supra* at 278–79.

Although this circuit has indicated that "intent" is the critical factor in assessing sham litigation, *Mark Aero, Inc. v. Trans World Airlines, Inc.*, 580 F.2d 288, 297 (8th Cir.1978), we have not extended sham analysis to require submission of factual intent to the degree urged by South Dako-

---

**29.** This is not true here because the district court certified the question of KCS standing under 28 U.S.C. § 1292(b) as an issue where reasonable minds might differ. We find that KCS had a reasonable basis in law and fact in asserting standing in the *Andrews* litigation.

ta. In fact, this court has granted a summary judgment under an analogous circumstance where litigation was successful and consequently deemed to preclude a finding of sham or unlawful intent. *Razorback Ready Mix Concrete Co. v. Weaver*, 761 F.2d 484, 487 (8th Cir.1985).[30]

However, even if we were to apply SD's interpretation of the Fifth Circuit's analysis in *Burlington Northern*, when the pre-December, 1981, petitioning activities are excluded we must hold that no evidence exists in the record in this case to suggest that KCS did not possess the intent to succeed in the *Andrews* litigation. In so holding we deem it significant that in *Burlington Northern* the parties were merely at the pretrial stage and the court was appraising sham litigation in terms of whether there was sufficient evidence based on the totality of KCS' petitioning activities to allow discovery as to KCS' intent. The court already had evidence of improper intent of KCS manifested by the pre–1982 window litigation. It was dealing with the overall allegation of an antitrust conspiracy extending through the entire record from the mid–1970's to 1984. Here the window litigation is immaterial, as was any involvement with the EIS proceedings in which SD joined with KCS in opposing ETSI project. The significant portion of

these activities occurred before the execution of the SDCD/ETSI contract in December, 1981. There is no evidence to prove that KCS' involvement in the *Andrews* litigation following December, 1981, was not significantly motivated by a desire to prevail on the merits. Moreover, the plaintiffs did prevail in *Andrews*, thereby proving that there was a reasonable basis for the lawsuit. *See Bill Johnson's Restaurants, Inc. v. NLRB*, 461 U.S. 731, 743, 749, 103 S.Ct. 2161, 2170, 2173, 76 L.Ed.2d 277 (1983); *Razorback Ready Mix Concrete Co. v. Weaver*, 761 F.2d 484, 487 (8th Cir. 1985); *Columbia Pictures Indus., Inc. v. Redd Horne, Inc.*, 749 F.2d 154, 161 (3d Cir.1984); *Omni Resource Dev. Corp. v. Conoco, Inc.*, 739 F.2d 1412, 1414 (9th Cir. 1984); *Taylor Drug Stores, Inc. v. Associated Dry Goods Corp.*, 560 F.2d 211, 213–14 (6th Cir.1977); *Edward B. Marks Music Corp. v. Colorado Magnetics, Inc.*, 497 F.2d 285, 290–91 (10th Cir.1974). Consequently, we hold as a matter of law that KCS' petitioning in the *Andrews* litigation was not sham and was fully protected under the first amendment because a significant factor in pursuing the action was the actual desire to obtain judicial relief and there was a reasonable basis for the action.

We therefore conclude that the judgment of the district court should be vacated on

---

**30.** This is not to say that successful litigation shall categorically preclude a finding of sham. The Honorable Richard A. Posner, Circuit Judge of the United States Court of Appeals for the Seventh Circuit, has aptly described a number of circumstances where a lawsuit may have a reasonable basis and yet be undeserving of first amendment protection:

> Many claims not wholly groundless would never be sued on for their own sake; the stakes, discounted by the probability of winning, would be too low to repay the investment in litigation. Suppose a monopolist brought a tort action against its single, tiny competitor; the action had a colorable basis in law; but in fact the monopolist would never have brought the suit—its chances of winning, or the damages it could hope to get if it did win, were too small compared to what it would have to spend on the litigation —except that it wanted to use pretrial discovery to discover its competitor's trade secrets; or hoped that the competitor would be required to make public disclosure of its potential liability in the suit and that this disclo-

> sure would increase the interest rate that the competitor had to pay for bank financing; or just wanted to impose heavy legal costs on the competitor in the hope of deterring entry by other firms. In these examples the plaintiff wants to hurt a competitor not by getting a judgment against him, which would be a proper objective, but just by the maintenance of the suit, regardless of its outcome.

*Grip–Pak, Inc. v. Illinois Tool Works, Inc.*, 694 F.2d 466, 472 (7th Cir.1982) (citations omitted). *See also Westmac, Inc. v. Smith*, 797 F.2d 313, 315–18 (6th Cir.1986); *Sunergy Communities, Inc. v. Aristek Properties, Ltd.*, 535 F.Supp. 1327, 1331 (D.Colo.1982); Kintner & Bauer, *Antitrust Exemptions for Private Requests for Governmental Action: A Critical Analysis of the Noerr–Pennington Doctrine*, 17 U.C. Davis L.Rev. 549, 576 & n. 113 (1984). The instant case, however, can be distinguished from the circumstances described by Judge Posner in that the *Andrews* litigation went far beyond the pretrial stage. Moreover, there really is no dispute that, regardless of its motive, KCS genuinely sought judicial relief.

the grounds that (1) the State of South Dakota had no standing to bring the antitrust claim and (2) the evidence fails to show that KCS improperly interfered with the SDCD/ETSI contract through the petitioning activities occurring after December 23, 1981.

Judgment reversed and dismissed; the district court is instructed to enter judgment for the defendants.